## UNITED STATES v. BHAGAT SINGH THIND.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 202. Argued January 11, 12, 1923.—Decided February 19, 1923.

1. A high caste Hindu, of full Indian blood, born at Amrit Sar, Punjab, India, is not a "white person", within the meaning of Rev. Stats., § 2169, relating to the naturalization of aliens. P. 207.
2. "Free white persons," as used in that section, are words of common speech, to be interpreted in accordance with the understanding of the common man, synonymous with the word "Caucasian" only as that word is popularly understood. P. 214. *Ozawa* v. *United States,* 260 U. S. 178.
3. The action of Congress in excluding from admission to this country all natives of Asia within designated limits including all of India, is evidence of a like attitude toward naturalization of Asians within those limits. P. 215.

QUESTIONS certified by the Circuit Court of Appeals, arising upon an appeal to that court from a decree of the District Court dismissing, on motion, a bill brought by the United States to cancel a certificate of naturalization.

*Mr. Solicitor General Beck,* with whom *Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, was on the brief, for the United States.

· *Mr. Will R. King,* with whom *Mr. Thomas Mannix* was on the brief, for Bhagat Singh Thind. ·

Section 2169, Rev. Stats., applies " to aliens being free white persons and to aliens of African nativity and to persons of ' African descent." It may be assumed that the terms " Caucasian " and "white persons" are synonymous.

In the latter part of the Eighteenth Century Blumenbach divided the human race into five groups, namely, the Caucasian, the Mongolian, the Ethiopian, the Malay and the American Indian; and, while this classification has been the subject of much criticism, it has stood the test of time and is practical. Blumenbach's Life and Works, p. 265; Enc. Brit., tit. "Anthropology;" Huxley, Man's Place in Nature, p. 372; *In re Saito,* 62 Fed. 126; Taylor, Origin of the Aryans, p. 2; Bopp's Comparative Grammar (1833-1835); Mueller, Survey of Languages, p. 29; Mueller, Home of Aryans, p. 48; 14 Enc. Brit., pp. 382, 487; Peschel, Races of Men (Leipsic, 1874), pp. 20, 270; Keane, Man: Past and Present, pp. 442, 443, 557; Keane, The World's Peoples, p. 404; Anderson, The Peoples of India (London, 1913), pp. 21, 27, 68; 2 Enc. Brit., pp. 712, 749.

The foregoing authorities show that the people residing in many of the states of India, particularly in the north and northwest, including the Punjab, belong to the Aryan race. The Aryan race is the race which speaks the Aryan language. It has been pointed out by many scholars that identity of language does not necessarily prove identity of blood, for ordinarily anyone can learn a foreign language. But this argument has no application to the Aryan of India; for, as far back as history

goes, the Aryans themselves have been the conquering race. No other race superimposed any foreign language upon them. The Aryan language is indigenous to the Aryan of India as well as to the Aryan of Europe.

The high-class Hindu regards the aboriginal Indian Mongoloid in the same manner as the American regards the negro, speaking from a matrimonial standpoint. The caste system prevails in India to a degree unsurpassed elsewhere. " Roughly, a caste is a group of human beings who may not intermarry, or (usually) eat with members of any other caste." Anderson, Peoples of India, p. 35.

With this caste system prevailing, there was comparatively a small mixture of blood between the different castes. Besides ethnological and philological aspects, it is a historical fact that the Aryans came to India, probably about the year 2000 B. C., and conquered the aborigines. See 2 Historians' History of the World, p. 475.

Upon the interpretation of § 2169, Rev. Stats., by the different federal courts, see *In re Singh,* 257 Fed. 209; *In re Mozumdar,* 207 Fed. 115; *In re Halladjian,* 174 Fed. 834; *United States* v. *Balsara,* 180 Fed. 694; *Dow* v. *United States,* 226 Fed. 145; *In re Najour,* 174 Fed. 735; *In re Ellis,* 179 Fed. 1002.

The Naturalization Act and the Immigration Act of February 5, 1917, relate to two entirely different subjects, and for that reason alone there could be no amendment to the Naturalization Act by implication.

Mr. Justice Sutherland delivered the opinion of the Court.

This cause is here upon a certificate from the Circuit Court of Appeals, requesting the instruction of this Court in respect of the following questions:

" 1. Is a high caste Hindu of full Indian blood, born at Amrit Sar, Punjab, India, a white person within the meaning of section 2169, Revised Statutes?

" 2. Does the act of February 5, 1917, (39 Stat. L. 875, section 3) disqualify from naturalization as citizens those Hindus, now barred by that act, who had lawfully entered the United States prior to the passage of said act? "

The appellee was granted a certificate of citizenship by the District Court of the United States for the District of Oregon, over the objection of the naturalization examiner for the United States.    A bill in equity was then filed by the United States, seeking a cancellation of the certificate on the ground that the appellee was not a white person and therefore not lawfully entitled to naturalization.    The District Court, on motion, dismissed the bill (268 Fed. 683) and an appeal was taken to the Circuit Court of Appeals.    No question is made in respect of the individual qualifications of the appellee.    The sole question is whether he falls within the class designated by Congress as eligible.

Section 2169, Revised Statutes, provides that the provisions of the Naturalization Act " shall apply to aliens, being free white persons, and to aliens of African nativity and to persons of African descent."

If the applicant is a white person within the meaning of this section he is entitled to naturalization; otherwise not.    In *Ozawa* v. *United States,* 260 U. S. 178, we had occasion to consider the application of these words to the case of a cultivated Japanese and were constrained to hold that he was not within their meaning.    As there pointed out, the provision is not that any particular class of persons shall be excluded, but it is, in effect, that only white persons shall be included within the privilege of the statute.    " The intention was to confer the privilege of citizenship upon that class of persons whom the fathers knew as white, and to deny it to all who could not be so classified. It is not enough to say that the framers did not have in mind the brown or yellow races of Asia.    It is necessary to go farther and be able to say that had these particular

races been suggested the language of the act would have been so varied as to include them within its privileges," (p. 195) citing *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 644. Following a long line of decisions of the lower federal courts, we held that the words imported a racial and not an individual test and were meant to indicate only persons of what is *popularly* known as the Caucasian race. But, as there pointed out, the conclusion that the phrase " white persons " and the word " Caucasian " are synonymous does not end the matter. It enabled us to dispose of the problem as it was there presented, since the applicant for citizenship clearly fell outside the zone of debatable ground on the negative side; but the decision still left the question to be dealt with, in doubtful and different cases, by the " process of judicial inclusion and exclusion." Mere ability on the part of an applicant for naturalization to establish a line of descent from a Caucasian ancestor will not *ipso facto* and necessarily conclude the inquiry. " Caucasian " is a conventional word of much flexibility, as a study of the literature dealing with racial questions will disclose, and while it and the words " white persons " are treated as synonymous for the purposes of that case, they are not of identical meaning— *idem per idem.*

In the endeavor to ascertain the meaning of the statute we must not fail to keep in mind that it does not employ the word " Caucasian " but the words " white persons," and these are words of common speech and not of scientific origin. The word " Caucasian " not only was not employed in the law but was probably wholly unfamiliar to the original framers of the statute in 1790. When we employ it we do so as an aid to the ascertainment of the legislative intent and not as an invariable substitute for the statutory words. Indeed, as used in the science of ethnology, the connotation of the word is by no means clear and the use of it in its scientific sense as an equiva-

lent for the words of the statute, other considerations aside, would simply mean the substitution of one perplexity for another. But in this country, during the last half century especially, the word by common usage has acquired a popular meaning, not clearly defined to be sure, but sufficiently so to enable us to say that its popular as distinguished from its scientific application is of appreciably narrower scope. It is in the popular sense of the word, therefore, that we employ it as an aid to the construction of the statute, for it would be obviously illogical to convert words of common speech used in a statute into words of scientific terminology when neither the latter nor the science for whose purposes they were coined was within the contemplation of the framers of the statute or of the people for whom it was framed. The words of the statute are to be interpreted in accordance with the understanding of the common man from whose vocabulary they were taken. See *Maillard* v. *Lawrence,* 16 How. 251, 261.

They imply, as we have said, a racial test; but the term " race " is one which, for the practical purposes of the statute, must be applied to a group of living persons *now* possessing in common the requisite characteristics, not to groups of persons who are supposed to be or really are descended from some remote, common ancestor, but who, whether they both resemble him to a greater or less extent, have, at any rate, ceased altogether to resemble one another. It may be true that the blond Scandinavian and the brown Hindu have a common ancestor in the dim reaches of antiquity, but the average man knows perfectly well that there are unmistakable and profound differences between them today; and it is not impossible, if that common ancestor could be materialized in the flesh, we should discover that he was himself sufficiently differentiated from both of his descendants to preclude his racial classification with either. The question for deter-

50947°—23——14

mination is not, therefore, whether by the speculative processes of ethnological reasoning we may present a probability to the scientific mind that they have the same origin, but whether we can satisfy the common understanding that they are now the same or sufficiently the same to justify the interpreters of a statute—written in the words of common speech, for common understanding, by unscientific men—in classifying them together in the statutory category as white persons. In 1790 the Adamite theory of creation—which gave a common ancestor to all mankind—was generally accepted, and it is not at all probable that it was intended by the legislators of that day to submit the question of the application of the words " white persons " to the mere test of an indefinitely remote common ancestry, without regard to the extent of the subsequent divergence of the various branches from such common ancestry or from one another.

The eligibility of this applicant for citizenship is based on the sole fact that he is of high caste Hindu stock, born in Punjab, one of the extreme northwestern districts of India, and classified by certain scientific authorities as of the Caucasian or Aryan race. The Aryan theory as a racial basis seems to be discredited by most, if not all, modern writers on the subject of ethnology. A review of their contentions would serve no useful purpose. It is enough to refer to the works of Deniker (Races of Man, 317), Keane (Man: Past and Present, 445–6), Huxley (Man's Place in Nature, 278) and to the Dictionary of Races, Senate Document No. 662, 61st Cong., 3d sess., 1910–1911, p. 17.

The term "Aryan" has to do with linguistic and not at all with physical characteristics, and it would seem reasonably clear that mere resemblance in language, indicating a common linguistic root buried in remotely ancient soil, is altogether inadequate to prove common racial origin. There is, and can be, no assurance that the so-called

Aryan language was not spoken by a variety of races living in proximity to one another. Our own history has witnessed the adoption of the English tongue by millions of Negroes, whose descendants can never be classified racially with the descendants of white persons notwithstanding both may speak a common root language.

The word "Caucasian" is in scarcely better repute.[1] It is at best a conventional term, with an altogether fortuitous origin,[2] which, under scientific manipulation, has come to include far more than the unscientific mind suspects. According to Keane, for example, (The World's Peoples, 24, 28, 307, *et seq.*) it includes not only the Hindu but some of the Polynesians,[3] (that is the Maori, Tahitians, Samoans, Hawaiians and others), the Hamites of Africa, upon the ground of the Caucasic cast of their features, though in color they range from brown to black. We venture to think that the average well informed white American would learn with some degree of astonishment that the race to which he belongs is made up of such heterogeneous elements.[4]

---

[1] Dictionary of Races, *supra,* p. 31.

[2] 2 Encyclopædia Britannica (11th ed.), p. 113: "The ill-chosen name of Caucasian, invented by Blumenbach in allusion to a South Caucasian skull of specially typical proportions, and applied by him to the so-called white races, is still current; it brings into one race peoples such as the Arabs and Swedes, although these are scarcely less different than the Americans and Malays, who are set down as two distinct races. Again, two of the best-marked varieties of mankind are the Australians and the Bushmen, neither of whom, however, seems to have a natural place in Blumenbach's series."

[3] The United States Bureau of Immigration classifies all Pacific Islanders as belonging to the "Mongolic grand division." Dictionary of Races, *supra,* p. 102.

[4] Keane himself says that the Caucasic division of the human family is "in point of fact the most debatable field in the whole range of anthropological studies." Man: Past and Present, p. 444.

And again: "Hence it seems to require a strong mental effort to sweep into a single category, however elastic, so many different

The various authorities are in irreconcilable disagreement as to what constitutes a proper racial division. For instance, Blumenbach has five races; Keane following Linnaeus, four; Deniker, twenty-nine.[5] The explanation probably is that "the innumerable varieties of mankind run into one another by insensible degrees,"[6] and to arrange them in sharply bounded divisions is an undertaking of such uncertainty that common agreement is practically impossible.

It may be, therefore, that a given group cannot be properly assigned to any of the enumerated grand racial divisions. The type may have been so changed by intermixture of blood as to justify an intermediate classification. Something very like this has actually taken place in India. Thus, in Hindustan and Berar there was such an intermixture of the "Aryan" invader with the dark-skinned Dravidian.[7]

In the Punjab and Rajputana, while the invaders seem to have met with more success in the effort to preserve

peoples—Europeans, North Africans, West Asiatics, Iranians and others all the way to the Indo-Gangetic plains and uplands, whose complexion presents every shade of color, except yellow, from white to the deepest brown or even black.

"But they are grouped together in a single division, because their essential properties are one, . . . their substantial uniformity speaks to the eye that sees below the surface . . . we recognize a common racial stamp in the facial expression, the structure of the hair, partly also the bodily proportions, in all of which points they agree more with each other than with the other main divisions. Even in the case of certain black or very dark races, such as the Bejas, Somali, and a few other Eastern Hamites, we are reminded instinctively more of Europeans or Berbers than of negroes, thanks to their more regular features and brighter expression." *Id.* 448.

[5] Dictionary of Races, *supra*, p. 6. See, generally, 2 Encyclopædia Britannica, (11th ed.), p. 113.

[6] 2 Encyclopædia Britannica, 11th ed., p. 113.

[7] 13 Encyclopædia Britannica, (11th ed.), p. 502.

their racial purity,[8] intermarriages did occur producing an intermingling of the two and destroying to a greater or less degree the purity of the "Aryan " blood. The rules of caste, while calculated to prevent this intermixture, seem not to have been entirely successful.[9]

It does not seem necessary to pursue the matter of scientific classification further. We are unable to agree with the District Court, or with other lower federal courts, in the conclusion that a native Hindu is eligible for naturalization under § 2169. The words of familiar speech, which were used by the original framers of the law, were intended to include only the type of man whom they knew as white. The immigration of that day was almost exclusively from the British Isles and Northwestern Europe, whence they and their forbears had come. When they extended the privilege of American citizenship to " any alien, being a free white person," it was these immigrants—bone of their bone and flesh of their flesh—and their kind whom they must have had affirmatively in mind. The succeeding years brought immigrants from Eastern, Southern and Middle Europe, among them the Slavs and the dark-eyed, swarthy people of Alpine and Mediterranean stock, and these were received as unquestionably akin to those already here and readily amalgamated with them. It was the descendants of these, and

---

[8] *Id.*

[9] 13 Encyclopædia Britannica, p. 503: " In spite, however, of the artificial restrictions placed on the intermarrying of the castes, the mingling of the two races seems to have proceeded at a tolerably rapid rate. Indeed, the paucity of women of the Aryan stock would probably render these mixed unions almost a necessity from the very outset; and the vaunted purity of blood which the caste rules were calculated to perpetuate can scarcely have remained of more than a relative degree even in the case of the Brahman caste."

And see the observations of Keane (Man: Past and Present, p. 561) as to the doubtful origin and effect of caste.

other immigrants of like origin, who constituted the white population of the country when § 2169, reënacting the naturalization test of 1790, was adopted; and there is no reason to doubt, with like intent and meaning.

What, if any, people of primarily Asiatic stock come within the words of the section we do not deem it necessary now to decide. There is much in the origin and historic development of the statute to suggest that no Asiatic whatever was included. The debates in Congress, during the consideration of the subject in 1870 and 1875, are persuasively of this character. In 1873, for example, the words " free white persons " were unintentionally omitted from the compilation of the Revised Statutes. This omission was supplied in 1875 by the act to correct errors and supply omissions. C. 80, 18 Stat. 318. When this act was under consideration by Congress efforts were made to strike out the words quoted, and it was insisted upon the one hand and conceded upon the other, that the effect of their retention was to exclude Asiatics generally from citizenship. While what was said upon that occasion, to be sure, furnishes no basis for judicial construction of the statute, it is, nevertheless, an important historic incident, which may not be altogether ignored in the search for the true meaning of words which are themselves historic. That question, however, may well be left for final determination until the details have been more completely disclosed by the consideration of particular cases, as they from time to time arise. The words of the statute, it must be conceded, do not readily yield to exact interpretation, and it is probably better to leave them as they are than to risk undue extension or undue limitation of their meaning by any general paraphrase at this time.

What we now hold is that the words " free white persons " are words of common speech, to be interpreted in accordance with the understanding of the common man, synonymous with the word " Caucasian " only as that

word is popularly understood. As so understood and used, whatever may be the speculations of the ethnologist, it does not include the body of people to whom the appellee belongs. It is a matter of familiar observation and knowledge that the physical group characteristics of the Hindus render them readily distinguishable from the various groups of persons in this country commonly recognized as white. The children of English, French, German, Italian, Scandinavian, and other European parentage, quickly merge into the mass of our population and lose the distinctive hallmarks of their European origin. On the other hand, it cannot be doubted that the children born in this country of Hindu parents would retain indefinitely the clear evidence of their ancestry. It is very far from our thought to suggest the slightest question of racial superiority or inferiority. What we suggest is merely racial difference, and it is of such character and extent that the great body of our people instinctively recognize it and reject the thought of assimilation.

It is not without significance in this connection that Congress, by the Act of February 5, 1917, c. 29, § 3, 39 Stat. 874, has now excluded from admission into this country all natives of Asia within designated limits of latitude and longitude, including the whole of India. This not only constitutes conclusive evidence of the congressional attitude of opposition to Asiatic immigration generally, but is persuasive of a similar attitude toward Asiatic naturalization as well, since it is not likely that Congress would be willing to accept as citizens a class of persons whom it rejects as immigrants.

It follows that a negative answer must be given to the first question, which disposes of the case and renders an answer to the second question unnecessary, and it will be so certified.

_Answer to question No. 1, No._