## UNITED STATES v. CARTOZIAN.

(District Court, D. Oregon.   July 27, 1925.)

**1. Aliens ⬅61—Mere color of individual not proper test for eligibility to citizenship; "free white person."**

In determining whether an alien is a free white person, eligible to citizenship, under Rev. St. § 2169 (Comp. St. § 4358), mere color of skin of the individual is not practical test, but proper test is racial, and must be applied to group of living persons possessing in common requisite characteristics for naturalization, nor is it wholly determined by ethnological and scientific research, but must satisfy common understanding as to whether such persons come within statutory category as white persons.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, White Persons.]

**2. Aliens ⬅61—Armenian held "free white person," eligible to naturalization.**

Armenians are free white persons within meaning of Rev. St. § 2169 (Comp. St. § 4358), so as to be eligible for naturalization as American citizens; it being the overwhelming opinion of anthropologists and other authorities that Armenians in Asia Minor are white persons within common usage of term, and amalgamate readily with other white people.

In Equity.   Suit by the United States of America against Tatos O. Cartozian to cancel defendant's certificate of naturalization. Suit dismissed.

John S. Coke, V. W. Tomlinson, and J. O. Stearns, Jr., all of Portland, Or., for the United States.

McCamant & Thompson, of Portland, Or., and William D. Guthrie, of New York City, for defendant.

WOLVERTON, District Judge.   This is a suit on the part of the government to cancel defendant's certificate of naturalization, on the ground that, at the time of the issuance of his certificate, he was not, nor is he now, entitled to naturalization as a citizen of the United States.

Defendant is a native of that part of the Turkish Empire known as Turkey in Asia, or Asia Minor, having been born in Sivas, which is located in Western Armenia, towards Anatolia, and is of Armenian blood and race.   It is alleged that he is not a free white person within the meaning of the naturalization laws of Congress.   No charge of fraud is made, and the sole question to be determined is whether defendant is to be classed, for naturalization purposes, as a "free white person," as those words are used in section 2169, R. S. (Comp. St. § 4358).

[1] It is now judicially determined that the mere color of the skin of the individual does not afford a practical test as to whether he is eligible to American citizenship, as that differs greatly among persons of the same race, "even among Anglo-Saxons, ranging by imperceptible gradations from the fair blond to the swarthy brunette; the latter being darker than many of the lighter hued persons of the brown or yellow races."   Ozawa v. United States, 260 U. S. 178, 197, 43 S. Ct. 65, 69 (67 L. Ed. 199).

The test is racial, and for practical purposes of the statute must be applied to a group of living persons now possessing in common the requisite characteristics for naturalization.   Nor is it one to be wholly determined by ethnological and scientific research, but it must satisfy the common understanding that the racial characteristics are now the same, or sufficiently so to justify the interpreters of the statute—written in the words of common speech for common understanding by unscientific men—in classifying such persons together in the statutory category as white persons.   United States v. Thind, 261 U. S. 204, 209, 43 S. Ct. 338, 67 L. Ed. 616.   In defining the type of person eligible to citizenship, the court uses this language:

"The words of familiar speech, which were used by the original framers of the law, were intended to include only the type of man whom they knew as white.   The immigration of that day was almost exclusively from the British Isles and Northwestern Europe, whence they and their forbears had come. When they extended the privilege of American citizenship to 'any alien, being a free white person,' it was these immigrants—bone of their bone and flesh of their flesh—and their kind whom they must have had affirmatively in mind.   The succeeding years brought immigrants from Eastern, Southern, and Middle Europe, among them the Slavs and the dark-eyed, swarthy people of Alpine and Mediterranean stock, and these were received as unquestionably akin to those already here and readily amalgamated with them.   It was the descendants of these, and other immigrants of like origin, who constituted the white population of the country when section 2169, re-enacting the naturalization test of 1790, was adopted; and there is no reason to doubt, with like intent and meaning."

It was not deemed necessary in the Thind Case to decide what, if any, people of primary Asiatic stock came within the words of the section.   The thought of the court, speaking generally, is that each individual case must be determined upon its own peculiar

characteristics, to be gathered in terms of the language of common understanding in the realm at the time of the adoption of the statute.

[2] That the Armenians are of the Alpine stock can scarcely be doubted. The earliest authorities so classify them, as well as those coming later. Herodotus, book 7, c. 73 (Rawlinson's Translation [3d Ed.] vol. 4, p. 67), classifies them as Phrygians, but during their abode in Europe they bore the name of Brigians.

According to Strabo, book XI, § 14, there exists a sort of relationship between the Medes and the Armenians on the one hand, and the Thessalians on the other. Strabo lived about the middle of the first century B. C.

D. C. Brinton, in his work on Races and Peoples, p. 167, says: "Its latest contingent, the Armenian people, was a branch of the Thracian Briges and occupied their territory in Asia Minor about 700 B. C."

H. F. B. Lynch, Armenia, Travels and Studies, London, 1901, vol. 2, p. 67: "All the evidence points to the conclusion that they [the Armenians] entered their historical seats from the west, as a branch of a considerable immigration of Indo-European peoples, crossing the straits from Europe into Asia Minor and perhaps originally coming from their homes in the steppes north of the Black Sea."

W. Z. Ripley, in Races of Europe, p. 448, referring to Von Luschan as most competent authority, declares: "The continuity of the Alpine race across Asia Minor cannot be doubted."

The witness Roland Burrage Dixon says of Von Luschan that he "was one of the outstanding anthropologists of Germany, who died this last year." He says also that Prof. A. C. Haddon, professor of anthropology at Cambridge University, in his work The Races of Man and their Distribution, pp. 15, 16, "classes the Armenians specifically as belonging to the Alpine race, grouping them with the Cevenoles of Central Europe and the Dinaric group in the Balkan region, which he regards as 'probably an offshoot from the Anatolian,' and which, in his understanding, is essentially synonymous with Armenian." Dixon, who himself is an author, and has written a work entitled "The Racial History of Man," classifies the Armenians as "unquestionably of the Alpine type." Many authorities are referred to by him, all confirming the foregoing declarations of the authors noted.

The witness Franz Boas, professor of anthropology, Columbia University, a lecturer and author on the subject, says: "The Alpine group is divided nowadays into the western Alpine and the Dinaric type." Dinaric "is derived from the Dinaric Alps, or the Eastern Alps, and that term is taken from the name of the highest mountain, Dinara." Those Alps are located "northeast of the Adriatic." Prof. Boas, further referring to the authors and writers mentioned by Dixon in his testimony, considers them entirely reliable, and continues: "The weight of the authority has been such, that their conclusions have been accepted without hesitation, particularly the evidence in regard to the European origin of the Armenians and their migration into Asia Minor. The evidence is so overwhelming that nobody doubts any more their early migration from Thrace across the Hellespont into Asia Minor."

Although the Armenian province is within the confines of the Turkish Empire, being in Asia Minor, the people thereof have always held themselves aloof from the Turks, the Kurds, and allied peoples, principally, it might be said, on account of their religion, though color may have had something to do with it. The Armenians, tradition has it, very early, about the fourth century, espoused the Christian religion, and have ever since consistently adhered to their belief, and practiced it. Whatever analogy there may be or may exist between the Caucasian and the white races that may be of assistance in the present controversy, the alliance of the Armenians with the Caucasians of Russia has ever been very close. Indeed, the Armenians have for many generations, possibly centuries, occupied territory in Caucasian Russia, have intermingled freely and harmoniously with that people, and the races mix and amalgamate readily and spontaneously. This is strongly evidentiary of the kinship of the two types of people, and that both are of the Alpine stock. The status of these people thus evolved would seem to be practically conclusive of their eligibility to citizenship in the United States, seeing that they are of Alpine stock, and so remain to the present time, without appreciable blending with the Mongolian or other kindred races.

But to pursue the inquiry further, it may be confidently affirmed that the Armenians are white persons, and moreover that they readily amalgamate with the European and white races.

Dr. Paul Rohrbach of Berlin, a scholar of note, who was for eight years professor of geography and political economy in a commercial academy in Berlin, has traveled extensively in many countries, including Armenia in Asia Minor, has made a specialty of studying history, philology, and ethnology, particularly with reference to Russia, Asia Minor, and the Near East, and has written six or seven books and a number of magazine articles, gives it as his experience that the color line is not drawn against the Armenians anywhere in the world. As to amalgamation with the white races, he affirms that there are thousands and thousands of intermarriages between Russians and Armenians; there existing no prejudice between these races of people. He mentions an Armenian who became a count in Russia, marrying a Russian countess or baroness, and an Armenian missionary who married a German baroness. Broadening the scope of his reply, he found Armenians intermarrying with white people everywhere.

The witness Dixon, a profound scholar, now professor of anthropology at Harvard University, who has written extensively on anthropology and ethnology, and who attended President Wilson as a government representative on the subject of ethnography during the Peace Conferences at Versailles, gives it as his conviction that the weight of authority is overwhelmingly in favor of the proposition that Armenians are white persons, and that Caucasian and European, as used in common speech, are practically synonymous; at least such is the case in current usage. He further affirms that the Armenians readily assimilate with the people of France, Germany, and Russia.

Dr. Barton is foreign secretary of the American Board of Commissioners for Foreign Missions. He established his home at Harpoot in September, 1885, and remained there until the summer of 1892, when he returned to this country. In 1919 he went again, as the head of the relief expedition under the Near East relief, into Turkey and Armenia, where he carried on relief work. During his early work in his mission field, he prepared an article for the Encyclopedia of Missions, on the subject of "Armenia and the Armenians." He testifies: "I never have heard it suggested that they [the Armenians] were not white. In all the conversations with Americans and foreigners, we have always regarded them as white. * * * There were occasionally colored people came through the country, but they were always marked as completely distinguishable from the Armenians, who were never referred to in any way except as white, never thought of in any other terms than white persons." When asked, "As the terms 'white' and 'white persons' are commonly and popularly used in the United States and Canada and Europe, would you class the Armenians in your opinion as 'white persons'?" he answered, "I surely would." Later he says, "It is generally considered that they [the Armenians] are of the Alpine class of whites." The witness further affirms that they readily assimilate with the Europeans and the people of this country. Within his own information, he knows of ten or fifteen Armenians in Boston who have married American wives.

Dr. Boas affirms, after reference to many authorities on anthropology and ethnology, that "it would be utterly impossible to classify them [Armenians] as not belonging to the white race."

M. Vartan Malcolm, who was born in Sivas, Armenia, has been naturalized in this country, is an attorney of standing in New York City, and has written a work on the Armenians in America, was a witness in the case at bar. He has gathered many statistics respecting his own race in the United States. He shows that, according to the census of 1920, there were then foreign-born Armenians in the United States, 37,647; native white persons, both parents Armenian, 14,047; native white persons, one parent Armenian and the other not, 1,146—making a total of 52,840. From the same census, he finds the number of Armenians naturalized to be 10,574. He also gives a table as a result of special inquiry made of 339 persons; the object being to ascertain the extent of intermarriage among the Armenians, which discloses that of the number, 257 were married—125 to Armenian girls, and 132 to native white Americans, or, in a few instances, girls of Irish, German, Swiss, or French parentage. True, this information was gathered through means of questionnaires sent out by witness, but he states that he has personal acquaintance with by far the larger proportion of the persons of whom such inquiry was made.

Prof. Boas cites a work of Julius Drachsler, entitled "Intermarriage in New York City," compiled by the examination of about 100,000 marriage certificates issued by the clerk of the city of New York, from which it is deduced that for the first generation of immigrants the intermarriage rate is 10.4 per cent. "That," says the witness, "means that 10 per cent. of the first generation of

immigrants marry people not belonging to their nationality. * * * Now the rate for Armenians is practically the same as the average rate. It is 9.63."

Mrs. Otis Floyd Lamson, who was born in Erzerum, Armenia, acquired her principal education at the University of Berlin, having mastered six or seven languages, has traveled extensively, has taught French and German in a girls' school in this country, has also tutored, is a member of many social and educational clubs and organizations, was naturalized in 1911, married an American citizen born in Wisconsin, and is very intellectual and highly cultivated, was called as a witness, and gave it as her testimony that "the Armenians here very readily assimilate the American home life, provided they speak English." In her experience, she has found no discrimination respecting the intermarriage of men and women of Armenian blood with native Americans; nor has she found that the question of color or race enters as an obstacle.

I have confined my investigation to the testimony found in the record, and have made no attempt at independent investigation respecting race, color, assimilation, or amalgamation.

The testimony here adduced would seem to meet the concept essential to eligibility for naturalization under section 2169, R. S., first, that Armenians in Asia Minor are of the Alpine stock, of European persuasion; second, that they are white persons, as commonly recognized in speech of common usage, and as popularly understood and interpreted in this country by our forefathers, and by the community at large, when section 2169 was adopted by Congress, and later confirmed; third, that they amalgamate readily with the white races, including the white people of the United States.

As an authority of analogy respecting the eligibility of Armenians to naturalization, see In re Halladjian (C. C.) 174 F. 834.

The judgment of the court will therefore be that the bill of complaint be dismissed.