### KISHAN SINGH v. CARR, Immigration Director.

### No. 8308.

Circuit Court of Appeals, Ninth Circuit.
March 8, 1937.

. See, also, Kishan Singh v. District Director of Immigration (C.C.A.) 83 F.(2d) 95.

William H. Wylie, of San Diego, Cal., for appellant.

Peirson M. Hall, U. S. Atty., and Howard V. Calverley, Asst. U. S. Atty., both of Los Angeles, Cal., for appellee.

Before WILBUR and GARRECHT, Circuit Judges, and NETERER, District Judge.

GARRECHT, Circuit Judge.

The appellant was born in Pubhana, Ludhiana District, in Punjab, British East India. He is a Hindu of the Sikh caste, and belongs to the Pubhana Tribe. He asserts

that he last entered the United States in June, 1923, from Mexico, at a point two or three miles west of Mexicali, Lower California, Mexico, and Calexico, California, and that from the time of his entry until May, 1932, he resided in Northern California, Utah, Nevada, and Wyoming.

On the other hand, an assistant to the United States Secretary of Labor, on August 3, 1934, issued a warrant of arrest against the appellant, in deportation proceedings, alleging that the appellant landed at "an unknown port" of the United States subsequently to July 1, 1924, in violation of sections 3 and 19 of the Immigration Act of February 5, 1917, as amended (8 U.S.C.A. §§ 136 and 155), and of section 13(a) and (c) of the Immigration Act of May 26, 1924 (8 U.S.C.A. § 213(a) and (c).

After a number of hearings, the assistant to the Secretary of Labor issued a warrant of deportation against the appellant, on the same grounds as those contained in the warrant of arrest. The appellant thereupon filed a petition for a writ of habeas corpus in the court below. After due proceedings had, the lower court entered an order that the writ theretofore issued be discharged, that the proceedings be dismissed, and that the appellant be remanded to the custody of the immigration authorities. From that order, the present appeal has been taken.

In subdivision (n) of 8 U.S.C.A. § 136, it is provided that natives of certain sections of Asia shall be excluded from admission into the United States. Among those excluded, both from admission and from citizenship, are natives of any part of India. United States v. Bhagat Singh Thind, 261 U.S. 204, 215, 43 S.Ct. 338, 341, 67 L.Ed. 616.

In 8 U.S.C.A. § 155, it is provided that, "At any time within five years after entry, any alien who at the time of entry was a member of one or more of the classes excluded by law" shall be deported.

The text of 8 U.S.C.A. § 213(a) and (c) is in part as follows:

"(a) No immigrant shall be admitted to the United States unless he (1) has an unexpired immigration visa * * *.

"(c) No alien ineligible to citizenship shall be admitted to the United States unless such alien (1) is admissible as a non-quota immigrant under the provisions of subdivision (b), (d), or (e) of section 204 of this title, or * * * (3) is not an immigrant as defined in section 203 of this title."

Finally, in 8 U.S.C.A. § 214, it is provided that: "Any alien who *at any time* after entering the United States is found to have been at the time of entry not entitled under this subchapter to enter the United States, or to have remained therein for a longer time than permitted under this subchapter or regulations made thereunder, shall be taken into custody and deported," etc. (Italics our own.)

The "subchapter" referred to in the foregoing provision is the Immigration Act of 1924, 8 U.S.C.A. § 201 et seq., and the provision in question is section 14 of that act (8 U.S.C.A. § 214).

■ Accordingly, the question of the date of the appellant's entry is the crucial one in the instant case. If he entered the United States before July 1, 1924, the effective date of 8 U.S.C.A. §§ 213 and 214, supra, the appellee is now barred from deporting him, under the limitations provision of five years in 8 U.S.C.A. § 155, supra. For the effective date referred to above, see section 31(a) and (c) of the Act of May 26, 1924, c. 190, 43 Stat. 169. Section 31(c) specifically provides: "If any alien arrives in the United States before July 1, 1924, his right to admission shall be determined without regard to the provisions of this Act, except section 23." Section 23 (8 U.S.C.A. § 221) places upon the alien the burden of proving lawful entry.

If, therefore, the appellant entered the United States after July 1, 1924, the appellee may deport him "at any time". Ohara v. Berkshire (C.C.A.9) 76 F.(2d) 204, 206.

Since the ultimate question herein relates to the date of the appellant's entry, we will summarize the evidence bearing upon this point, in order to ascertain whether such evidence sustains the findings of the assistant to the Secretary of Labor, to the effect that the appellant "landed at an unknown port subsequent [ly] to the 1st day of July, 1924," and the finding of the Board of Review that the appellant was in Mexico early in January, 1927.

In the first place, we will trace the numerous and serious discrepancies in the appellant's testimony.

When he was first examined by an immigrant inspector at El Centro, Cal., on July 9, 1934, the appellant testified that he last entered the United States in June, 1923, from a point two or three miles west of

Mexicali; that he was accompanied by Karm Singh, Sudargl Singh, Gunda Singh, Arjan Singh, and a Mexican boy; that the appellant and the four other men each paid the Mexican boy $200, to take them to Stockton, Cal.

The questioning then veered off to the appellant's movements before reaching the Mexican border. He stated that he first went from Pubhana, his home, to Shanghai, and then to Tientsin, where, for eight months, he was a watchman for the Asia Oil Company; that from Tientsin he went Kobe, Japan, remaining for 19 days; that he next went to Yokohama, Japan, and stayed there only long enough "to catch a boat"; that at Yokohama he boarded a Japanese ship, the Inyo Maru, for Manzanillo, Mexico; that the boat stopped at Honolulu, San Francisco, and Los Angeles en route to Manzanillo; that the appellant debarked at Manzanillo, where he stayed for three or four days; *and that he had a passport for Mexico.*

▮ Describing his trip from Manzanillo to Mexicali, the appellant testified that the journey was made by closed truck, consuming one day and one night. Judicial notice can be taken of the fact that the distance between Manzanillo and Mexicali is approximately 1,200 miles.

The appellant also testified that traveling on the same truck with him were *fourteen Mexicans and two Hindus*—Arjan Singh and "Sodagar" [Sudargl?] Singh; that the truck was driven by an American boy; that it left Manzanillo at about 5 o'clock in the evening and arrived at Mexicali at about 7 o'clock the following evening, or 26 hours later; that the appellant got off the truck "right in town" at Mexicali, some of his fellow passengers doing likewise and others not; that he paid the driver of the truck $20 for taking him from Manzanillo to Mexicali; that he remained in the latter place "about two days," spending the two nights "in some Mexican's house"; and that then he went to *the camp of Lakha Singh,* five or six miles west of Mexicali, with the two Hindus who had been with him on the truck.

The appellant stated that he stayed at the camp one day, and that two Mexicans whom he picked up there took him to Stockton in an automobile, by way of Indio, Cal.

He then outlined his movements in the various Western States already referred to, up to 1932, when he went to the Imperial Valley, Cal. At the time of his first hearing, he was still residing in the valley, on a ranch near Calipatria, Cal.

The appellant testified that, previously to the hearing, he had once before been "investigated" by Immigration officers—at Oroville, Cal., in 1931, when he was shot in the leg by another Hindu.

Near the close of his testimony, the alien declared that he had never been legally admitted into the United States.

After this first hearing, an assistant to the Secretary of Labor on August 3, 1934, issued a warrant for the appellant's arrest, ordering that the alien be granted a hearing to enable him to show cause why he should not be deported. The appellant was arrested under that warrant on January 21, 1935, and was arraigned at El Centro two days later, at which time he stated that he desired an opportunity to obtain a lawyer. Accordingly, further hearing on the matter was deferred until February 15, 1935, when he was represented by counsel. The appellant was released on bond.

At the hearing of February 15, 1935, the appellant said that he wished to make a further statement, because at the hearing of July 9, 1934, "in some places I made mistakes, because I did not think at that time, correctly."

He testified that he went from Yokohama to Manzanillo in a Japanese boat, *the name of which he did not remember,* and that he was working as seaman on that vessel. When reminded that in his earlier statement he had declared that he had arrived at Manzanillo on the Inyo Maru, he stated that he "was not sure at that time, either; it was just guesswork." "Sometimes people talk about 'Inyo Maru' or some other 'Marus,' so I said 'Inyo Maru.'"

The appellant further stated that *he had no passport for Mexico;* that a rowboat came to the ship; and that he "got into it and came ashore." The same rowboat took off two other men before taking the appellant, but made a separate trip for the appellant; so that when he was taken ashore there was no one else with him in the rowboat except the man in charge, according to the appellant's testimony.

The appellant testified that he stayed in Manzanillo *one night,* at the house of an unidentified Mexican; that on the following day he hired a truck that he met as he walked along the road, and arranged to have it take him to Mexicali.

There were twelve or thirteen persons on the truck, the alien testified—Mexicans, *Chinese, Filipinos,* and, he thought, *two Italians, but no other Hindus.* It will be recalled that in his earlier testimony he had said that there were fourteen Mexicans and two other Hindus aboard the truck. He rode in the truck for one night, and at 2 o'clock the next afternoon he got out and continued to Mexicali on foot, he said.

After testifying that he walked "all the way," the appellant stated that he walked for two or three days after leaving the first truck, and then got a ride in a second one, boarding it in the afternoon and leaving it at 10 or 11 o'clock the following morning. Reminded that he had testified at the first hearing that it had taken him "one day and a night" to go from Manzanillo to Mexicali, the appellant insisted he had said that he "rode in a truck one day and one night."

Finally, an automobile picked him up one afternoon, "and before sundown I was in Mexicali."

The appellant said that *he tried to find some Hindus in Mexicali, but could not,* so that he stayed with some Mexicans. Indeed, he stated that *he saw no Hindus at any time while he was in Mexico,* and repeatedly denied that he had previously testified that he went to the *camp of Lakha Singh.*

At that juncture, Inspector Gies, who was conducting the hearing, asked the interpreter whether the latter remembered the alien's having made such a statement at the first hearing. The interpreter replied in the affirmative.

The alien reiterated that he paid a Mexican $200 to bring him across the line into the United States, *even giving in broken Spanish the exact words that he used when asking the Mexican to smuggle him in.*

Later in the day, the appellant, being examined by his own attorney, testified that he entered the United States, not by crossing the Pacific on a Japanese boat from Yokohama, as he had twice previously sworn, *but by crossing some river that separates Mexico from Guatemala.*

The appellant then related how he and four other men—Sudagar Singh, Arjan Singh, Gundar Singh, and Partap Singh—crossed the river into Mexico, each of the four others paying a Mexican $8 to bring them across.

The appellant and his four companions walked along the railroad for 19 days, and finally reached Mexico City, proceeding thence by train to Guadalajara, Jalisco, where they remained a week, according to the appellant's testimony. From Guadalajara, he said, they went to Guaymas, Sonora, by mule, the trip requiring from three to five days.

After staying in Guaymas two weeks, the five men took a boat that transported them to a spot on the open shore, and the "boat man" put them into two barrels, the alien stated. According to his testimony, they paid the "boat man" $70 each, "and a car came along and took us to Mexicali." The four other Hindus also accompanied him into the United States, the alien said.

Asked why, during the morning session, he had testified that he had come in through Manzanillo, the appellant replied that he was "scared," because he had no passport. When he was questioned as to his reason for having stated that no one was with him when he came into the United States, he replied that, "Other people told me not to mention their names." It is worthy of note, however, that at the hearing of July 9, 1934, he gave the names of four Hindus that he said crossed the line with him.

In view of the glaring discrepancies in the appellant's testimony, it is necessary to advert only briefly to the rest of the evidence.

Noor Din, a Hindu farmer residing near Seeley, Cal., in the Imperial Valley, testified, at the hearing held on July 9, 1934, that he first met the appellant on November 20, 1926, in a saloon at Mexicali; that he saw the alien again in Mexicali, about fifteen or twenty days later, and again a month later, or about January 1, 1927, in Calexico; that he was surprised to see the appellant on the American side of the line, but that the latter told him that "he was a little sick and had a permit from some doctor on the other side to come over and get some medicine." The witness continued: "A short time after that I pointed him out to Chief Patrol Inspector Chaffin and told him that this Hindu was from Mexicali, so Mr. Chaffin talked to him, and the next time I saw him, Mr. Chaffin and he were going down the street towards the international line. Mr. Chaffin told me later that he would have deported him but he had a permit to get some medicine and he allowed him to get the medicine and took him back to Mexico."

Because of the appellant's claim that he was not afforded an opportunity to cross-examine Noor Din, we will set forth in full an interesting colloquy that occurred among the appellant, Noor Din, and the examining officer:

"NOTE. The following questions were asked by Immigrant Inspector Gerrish and translated into Hindustani by Interpreter:

"Q. Is this the man that you know as Kishan Singh? A. Yes.

"Q. Is this the man whom you first saw in the Mexicali saloon where the bartender only had one arm, across the tracks in Mexicali, in 1926? A. Yes, the same man.

"Q. Is this the same man whom you saw in Calexico getting his shoes shined in the early part of 1927, and who told you that he had a permit to come to Calexico from Mexicali to purchase some medicine? A. Yes.

"Q. Is this the same man who[m] you saw Inspector Chaffin return towards Mexicali with on that date? A. Yes.

"*Inspector Gerrish to Kishan Singh:* Q. You have heard the testimony of the witness. What have you to say regarding this testimony? A. All that I can say is that everything that he said is lies."

"*Inspector Gerrish to Noor Din:* Q. You heard the denial of Kishan Singh to your statements. Have you anything more to say in this regard? A. No."

"Hindu Witness, Noor Din, excused.

"*Inspector Gerrish to Kishan Singh:* Q. Have you anything more to say in this regard? A. The only thing that I can say is that when I was working on the railroad on this side how could Noor Din see me in Mexicali."

Inspector Chaffin corroborated the testimony of Noor Din. He stated that he first saw the appellant in Calexico in January, 1927; that he investigated the alien's presence in the United States, and found that the appellant was in Calexico to receive treatment from a doctor, having been permitted to come across the line; and that the witness personally saw the appellant's return to Mexico at that time.

Pursuing further our inquiry into the appellant's alleged lack of opportunity to cross-examine Noor Din, we find that at the close of the hearing of February 15, 1935, the examining inspector announced that if counsel for the appellant desired to have Noor Din produced for cross-examination, it would be necessary to continue the case, since Din had been called away by the illness of his daughter. It will be recalled that Din had testified on July 9, 1934, before the appellant was represented by counsel.

Counsel for the appellant stated that he desired to.cross-examine Din, and the case was deferred to February 28, 1935, by mutual consent.

On February 28, 1935, the following colloquy occurred between the examining inspector and counsel:

"Inspector Gies to Attorney: Mr. Wylie, you are advised that this Service has made every effort to locate Noor Din, who has mysteriously disappeared, and all efforts to ascertain his whereabouts have been futile, therefore we are unable to produce that witness for cross-examination. Have you any further evidence in behalf of the alien?

"By Attorney: I have no further evidence, but demand the opportunity to cross-examine Noor Din, being advised that cross-examination of Noor Din will develop evidence favorable to the alien.

"By Examining Inspector: This service has no assurance as to when Noor Din can be located; however, if you so desire, the service will continue this hearing and make further efforts to locate him.

"By Attorney: I do not feel that I can consent to a further continuance for the purpose of securing the presence of Noor Din, [because of] the expense placed upon the alien by reason of further hearing, without assurance that Noor Din can be secured as a witness, and I ask that the hearing be closed and the matter submitted."

■ It is well settled, in this circuit and elsewhere, that the Government's failure to produce a witness for cross-examination is excused, if such failure is due to the fact that the witness cannot be found. Quock So Mui v. Nagle (C.C.A.9) 11 F.(2d) 492, 493; United States ex rel. Ng Wing v. Brough (C.C.A.2) 15 F.(2d) 377, 379.

The appellant also complains that the transcript of testimony and of the proceedings before the examining inspector is "neither complete nor fair," for the reason that portions of the appellant's cross-examination of Inspector Chaffin, together with other material related thereto, have been omitted. The transcript as prepared shows only a part of a question propounded by counsel for the appellant, namely, "Q. Was the informant—"

The omitted part dealt with the examining inspector's instruction to the witness that the latter was not permitted by Department rules to answer a question regarding the identity of the person who first informed Inspector Chaffin, at his office in El Centro, regarding the appellant's presence in the United States. The transcript shows that counsel for the appellant was not otherwise restricted in his examination of the witness.

■ Technical errors or irregularities, without more, do not render an immigration hearing unfair. In United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 158, 44 S.Ct. 54, 57, 68 L.Ed. 221, Mr. Justice Brandeis said:

"Moreover, a hearing granted does not cease to be fair, merely because rules of evidence and of procedure applicable in judicial proceedings have not been strictly followed by the executive; or because some evidence has been improperly rejected or received. [Case cited.] To render a hearing unfair the defect, or the practice complained of, must have been such as might have led to a denial of justice, or there must have been absent one of the elements deemed essential to due process. [Cases cited.] * * *

"Irregularities on the part of the government official prior to, or in connection with, the arrest would not necessarily invalidate later proceedings in all respects conformable to law. 'A writ of habeas corpus is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and if sufficient ground for his detention by the government is shown, he is not to be discharged for defects in the original arrest or commitment.' [Cases cited.]"

See, also, Ex parte Keizo Kamiyama (C. C.A.9) 44 F.(2d) 503, 505; Murdoch v. Clark (C.C.A.1) 53 F.(2d) 155, 156.

■ Assuredly, the omission of a few sentences from the transcript of a hearing before an immigrant inspector, regarding a matter that could not possibly prejudice the substantial rights of the alien, does not render such hearing "unfair."

Next, the appellant assails the "power and jurisdiction of the Court to substitute new findings for those made by Secretary of Labor in deportation proceedings where latter's findings are insufficient in law or fact to sustain the order of deportation."

The Board of Review made the following findings:

"Although the alien insists that he entered the United States prior to July 1, 1924, his presence in Mexico was established by the testimony of Inspector M. L. Chaffin, who witnessed and identified this alien as the same person who departed to Mexico through Calexico, Cal., early in January, 1927. The alien had been admitted to the United States for medical attention and was escorted to Mexico by the inspector who testified. No evidence was offered by the alien other than his unsupported statement to prove his residence in the United States prior to July 1, 1924. * * *.

"It has been held that where the unsupported statement of an alien is the only evidence of his residence in the United States, such statement is overcome by any degree of evidence to the contrary."

In a memorandum of conclusions, the District Judge held as follows: "The Court concludes that petitioner entered the United States illegally, that he is an alien ineligible to citizenship, that by reason of material discrepancies in his testimony before the Immigration Department, the immigration authorities were warranted in holding that his testimony to the effect that he entered the United States prior to July 1, 1924, was not true, and that petitioner has failed to sustain the burden of proof that he has resided in the United States continuously since prior to July 1, 1924."

The appellant complains that the Secretary of Labor did not find that any "material discrepancies" existed in the appellant's testimony before the immigrant inspector, and that therefore the lower court's "new findings" of "material discrepancies" constitutes error.

■ In the first place, it is elementary that that a reviewing court may sustain the findings or judgment of an inferior tribunal on grounds other than those upon which such inferior tribunal based its findings or judgment. Compare Yangtsze Rapid S. S. Co. v. Deutsch-Asiatische Bank (C.C.A.9) 59 F.(2d) 8, 12; Mutual Lumber Co. v. Poe (C.C.A.9) 66 F.(2d) 904, 906, certiorari denied 290 U.S. 706, 54 S.Ct. 373, 78 L.Ed. 606; Stoody Co. v. Mills Alloys (C.C.A.9) 67 F.(2d) 807, 809, certiorari denied 292 U.S. 637, 54 S.Ct. 718, 78 L.Ed. 1489.

■ Secondly, the immigrant inspector who conducted the hearings at which the

appellant was represented by counsel, in his summary of the evidence stated that the appellant's testimony should "be disregarded owing to the inconsistency of his own claims as to his entry into the United States."

Finally, the cases cited by the appellant, dealing with the rule that the courts cannot "control or interfere with the determination" of fact-finding officials, are not applicable here. In the instant case, the board of review found that the appellant's statement as to residence was "unsupported." The court below concluded that his testimony, because of its material discrepancies, was "not true." Both conclusions tended to the ultimate determination that the appellant was not to be believed. The mere fact that the court below found, as we have found, "material discrepancies" in the appellant's testimony, which prompted the court to sustain the board's determination that the appellant had not entered the United States prior to July 1, 1924, clearly does not amount to "control" or "interference." We know of no rule of law that compels a reviewing court to close its eyes to glaring discrepancies, apparent on the face of the record, in sustaining the determination of a fact-finding body.

The third and last point raised by the appellant is that the Secretary of Labor erred in the assertion that "where the unsupported statement of an alien is the only evidence of his residence in the United States, such statement is overcome by any degree of evidence to the contrary."

Whether or not the foregoing assertion lays down the rule too broadly is a moot question, since there was ample evidence to sustain the findings of the immigrant inspector and of the board of review. Disregarding the testimony of Noor Din, we have the positive statement of Inspector Chaffin that, in January, 1927, the appellant was in Calexico, Cal., to receive medical treatment, by virtue of an arrangement under which the alien had been permitted to cross into the United States from Mexico; and that the inspector himself witnessed the appellant's return to Mexicali.

Both the examining inspector and the board of review believed Inspector Chaffin's testimony, referring to it in almost identical language: "The presence of this alien in Mexico was established through the testimony of Inspector M. L. Chaffin, who witnessed and identified this alien as the same person departing to Mexico through the port of Calexico early in January, 1927, this alien having been admitted to the United States for medical attention."

The appellant concedes that the amount of evidence necessary to overcome the unsupported statements of the alien "may be small, but its competency must be unquestioned." Here there is no question that the testimony given by Inspector Chaffin was competent, and that it was believed by the fact finders. We are not disposed to disturb their determination.

In a case of this character, "mere error, even if it consists in finding an essential fact without adequate supporting evidence, is not a denial of due process of law." United States ex rel. Tisi v. Tod, 264 U.S. 131, 134, 44 S.Ct. 260, 261, 68 L.Ed. 590. In the case just cited, the Government did not introduce any direct evidence to contradict the alien's testimony. In the present cause, however, the appellee offered the positive statement of an immigrant inspector, squarely rebutting the appellant's claim of residence. A fortiori, the language of Mr. Justice Brandeis in the Tisi Case, supra, is highly apposite here:

"The printed [seditious] matter found consisted of leaflets in the English language. Tisi testified that he cannot read English, that he did not know the character of the leaflets, and that his presence in the company of other Italians who were seen folding the leaflets was accidental. *The Secretary of Labor was not obliged to believe this testimony.* The government did not introduce any direct evidence to the contrary. But there was much evidence of other facts from which Tisi's knowledge of the character of the leaflets might reasonably have been inferred. We do not discuss the evidence, because the correctness of the judgment of the lower court is not to be determined by inquiring whether the conclusion drawn by the Secretary of Labor from the evidence was correct, or by deciding whether the evidence was such that, if introduced in a court of law, it would be held legally sufficient to prove the fact found.

"The denial of a fair hearing is not established by proving merely that the decision was wrong. [Case cited.] This is equally true whether the error consists in deciding wrongly that evidence introduced constituted legal evidence of the fact or in drawing a wrong inference from the evidence. The error of an administrative

**680**

tribunal may, of course, be so flagrant as to convince a court that the hearing had was not a fair one. Compare [cases named.] But here no hasty, arbitrary, or unfair action on the part of any official, or any abuse of discretion, is shown." [Italics our own.] · 264 U.S. 131, at pages 133, 134, 44 S.Ct. 260, 68 L.Ed. 590.

See, also, Tang Tun v. Edsell, 223 U. S. 673, 681, 682, 32 S.Ct. 359, 56 L.Ed. 606.

 Material discrepancies such as those found in the appellant's testimony "were sufficient to discredit the whole of his testimony, and his admission that he had committed perjury on the hearing justified the immigration officials in rejecting his statement that he had entered the United States" prior to July 1, 1924. Wong Fat Shuen v. Nagle (C.C.A.9) 7 F.(2d) 611, 612.

After a careful examination of the record herein, we find that the appellant was accorded a fair hearing by the immigration authorities, and that there was no denial of due process of law. The order of the court below discharging the writ of habeas corpus, dismissing the proceeding, and remanding the appellant to the custody of the Immigration and Naturalization Service, is therefore affirmed.

NETERER, District Judge.

I concur in affirmance.