## Ex parte MOHRIEZ.

### No. 1500.

### District Court, D. Massachusetts.

### April 13, 1944.

James P. O'Sullivan, of Lowell, Mass., for the Government.

Mohamed Mohriez, pro se.

WYZANSKI, District Judge.

The question is whether an Arabian is eligible for naturalization under § 303 of the Nationality Act of 1940, 8 U.S.C.A. § 703.

The petitioner, Mohamed Mohriez, like his parents and grandparents, was an Arab born in Sanhy, Badan, Arabia. Natives of that part of Asia are admissible to the United States as immigrants and are not barred by the provisions of Section 3 of the Immigration Act of February 5, 1917, 39 Stat. 874, 876, 8 U.S.C.A. § 136(n). Accordingly Mohriez was on January 15, 1921, admitted to the United States as an immigrant coming here for permanent residence. Mohriez regards himself and his immediate ancestors as being white persons belonging to the white race. He himself spoke Arabian as his native language.

The applicable statute, § 303 of the Nationality Act of 1940, 8 U.S.C.A. § 703, provides that "the right to become a naturalized citizen under the provisions of this chapter shall extend only to white persons, persons of African nativity or descent, and descendants of races indigenous to the Western Hemisphere."

The local representative of the Immigration and Naturalization Service, acting with the written approval of the Commissioner in Washington, recommends that the petition for citizenship be allowed. He informs me that the present practice of the Immigration and Naturalization Service is to regard Arabs, at any rate if born outside the barred zone, as white persons eligible to citizenship. [See an article en-

942

titled "The Eligibility of Arabs to Naturalization" in the official publication of the Department of Justice, Immigration and Naturalization Service, Monthly Review, October 1943, Vol. 1, No. 4, pp. 12–16. See also the unreported ruling of the Board of Immigration Appeals on October 18, 1941, in the case of Majid Ramsay Sharif.] But the representative also draws to my attention the fact that rulings adverse to Arabian applicants have been made by the United States District Courts for the Northern District of New York and for the Eastern District of Michigan. In re Ahmed Hassan, D.C.E.D.Mich., 48 F.Supp. 843.

If it were not for these rulings of other District Judges I should have granted the petition as of course and without any formal opinion. But in the light of those decisions, I shall briefly give the reasons why I have determined to grant the petition and admit Mohriez to citizenship.

■ In considering whether to grant the petition I as a District Judge must begin with the restrictive construction placed upon R.S. § 2169, 8 U.S.C.A. § 703 note, by the Supreme Court of the United States in Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67 L.Ed. 199, and United States v. Bhagat Singh Thind, 261 U.S. 204, 43 S.Ct. 338, 67 L.Ed. 616. After that construction was adopted, Congress re-enacted that statute as § 303 of the Nationality Act of 1940. The effect of those decisions and that re-enactment has been to reject the democratic argument, originally advanced by Mr. George W. Wickersham, that since 1870 Congress intended to allow naturalization of any person regardless of color (260 U. S. at pages 179–185, 43 S.Ct. at page 66, 67 L.Ed. 199), and also to reject the technical argument that Congress intended at least to allow naturalization of any person belonging to a race which ethnologists would call "white" (261 U.S. at pages 206–215, 43 S.Ct. at pages 339–341, 67 L.Ed. 616). Instead, as indicated by Judge A. N. Hand in Wadia v. United States, 2 Cir., 101 F.2d 7, 9, the question whether one is a "free white person" within the naturalization law has now become a question to be settled "in accordance with the understanding of the common man" and turns on whether the petitioner is a member of one of the "races [(a)] inhabiting Europe or [(b)] living along the shores of the Mediterranean" or [(c)], perhaps, is a member of a race of "Asiatics whose long contiguity to European nations and assimilation with their culture has caused them to be thought of as of the same general characteristics."

■ In the understanding of the common man the Arab people belong to that division of the white race speaking the Semitic languages. [Compare Motteux' use in 1695 of the term "white man". Oxford English Dictionary, vol. 12, p. 79.] Both the learned and the unlearned would compare the Arabs with the Jews towards whose naturalization every American Congress since the first has been avowedly sympathetic. [1 Annals of Congress, 1110.]

As every schoolboy knows, the Arabs have at various times inhabited parts of Europe, lived along the Mediterranean, been contiguous to European nations and been assimilated culturally and otherwise, by them. From the Battle of Tours to the capitulation of Granada, history records the wars waged in Europe by the Arabs. The names of Avicenna and Averroes, the sciences of algebra and medicine, the population and the architecture of Spain and of Sicily, the very words of the English language, remind us as they would have reminded the Founding Fathers of the action and interaction of Arabic and non-Arabic elements of our culture. [S. P. E. Tract No. XXXVIII, "Arabic Words in English" by Walt Taylor (1933) p. 594.] Indeed, to earlier centuries as to the twentieth century, the Arab people stand as one of the chief channels by which the traditions of white Europe, especially the ancient Greek traditions, have been carried into the present. [Compare Haskins, Renaissance of the Twelfth Century.] It follows that even by the narrow criteria which were adopted in the opinions of Mr. Justice Sutherland the Arab passes muster as a white person.

■ A further consideration supports the view that naturalization is available for Arabs coming from elsewhere than the barred zone. In the debates of Congress (54 Cong. Rec. part 3, pp. 2619, 2622) as well as in the decisions of the courts (United States v. Bhagat Singh Thind, 261 U.S. 204, 215, 43 S.Ct. 338, 67 L.Ed. 616) the naturalization and immigration acts have always been regarded as in pari materia. [F. G. Franklin, "The Legislative History of Naturalization in the United States, 1776-1795", Am. Hist. Ass'n., Annual Report (1901), vol. 1, p. 299.] The general policy has been to say that if a person is

admissible to the United States for permanent admission, he is susceptible of naturalization. This policy has obvious advantages. A person ought not to be encouraged to come here to live and to have children born here, who under the Fourteenth Amendment will automatically become citizens, unless we are prepared to give him the advantages of, and expect him to assume the obligations of, United States citizenship. It is contrary to our American creed to create a superior and inferior brand of permanent residents.

And finally it may not be out of place to say that, as is shown by our recent changes in the laws respecting persons of Chinese nationality and of the yellow race, we as a country have learned that policies of rigid exclusion are not only false to our professions of democratic liberalism but repugnant to our vital interests as a world power. In so far as the Nationality Act of 1940 is still open to interpretation, it is highly desirable that it should be interpreted so as to promote friendlier relations between the United States and other nations and so as to fulfill the promise that we shall treat all men as created equal.

Petition for citizenship granted.