Union Drainage District No. 6 of Towns of Bourbonnais and Manteno, Appellee, v. Manteno Limestone Company and Alice Morgan Montgomery, Appellants.

Gen. No. 10,396.

Heard in this court at the October term, 1949. Opinion filed July 13, 1950. Released for publication August 14, 1950.

NELSON, BOODELL & WILL, of Chicago, WALTER C. SCHNEIDER and VERNON G. BUTZ, both of Kankakee, for appellants; THOMAS J. BOODELL, THOMAS P. GRANT and JAMES A. DALEY, all of Chicago, of counsel.

SMALL & SALE, E. J. LAMARRE, and EVA L. MINOR, all of Kankakee, for appellee.

MR. JUSTICE BRISTOW delivered the opinion of the court.

Defendants, Manteno Limestone Company, a corporation, and Alice Morgan Montgomery, are prosecuting this appeal from a decree of the circuit court of Kankakee county permanently enjoining defendants from permitting any percolating water from the quarry, operated by the defendant corporation on the lands owned and leased by defendant Alice Morgan Montgomery, from entering the drains of the plaintiff, Union Drainage District No. 6.

In adjudging whether the injunction was properly issued, this court must determine three major legal propositions: First, whether the operation of the defendant corporation constituted "mining" within the terms of the Drainage and Levee Act; second, whether the Drainage District and the landowners acquired a right, either under the statute, or by prescription that the original use of the property at the time the

355

district was organized shall not be changed so as to increase the amount of water entering the district drains; and finally, whether the conduct of the defendants in increasing the flowage in the drains warranted the issuance of an injunction.

The proceeding was originally instituted by the plaintiff Drainage District and five individual landowners within the district. They originally predicated their right to injunctive relief on the theory that the water from defendant's quarry spread over the lands of the district, and increased the burden on the flowing capacity of the tiles so that in times of flood and high waters, they were not able to carry off all the water, thereby damaging the lands and destroying the crops within the district.

Defendant denied the allegations and asserted that any overloading of the tiles was due to causes other than its act, that plaintiffs suffered no damage and consequently were not entitled to injunctive relief, that defendant was engaged in a reasonable use of the land, the tiles and drains, and had entered the premises and expended substantial sums in operating its quarry without notice that such alleged use was unlawful.

From the evidence adduced before the master, it appears that the plaintiff district was originally organized under the Farm Drainage Act, and transformed on August 23, 1910, into a drainage and levee district under the Drainage and Levee Act, which provided a system of drainage for agricultural, sanitary and mining purposes. (Chapter 42, pars. 1-75, Ill. Rev. Stat. 1949 [Jones Ill. Stats. Ann. 42.006 *et seq.*].) By a court order of February 24, 1913, District No. 6 was enlarged and tiles were to be laid in the open ditch in the natural watercourse known as Soldiers Creek.

Within the boundaries of the plaintiff district is the land owned by the defendant Alice Morgan Montgomery, a portion of which was leased to the defendant

Manteno Limestone Company which engaged in the business of quarrying, processing, and selling agricultural limestone, fertilizer and road stone.

The evidence with reference to the overloading of the tiles was controverted, and consisted largely of conflicting statements of witnesses as to the amount of water found from time to time in plaintiffs' tiles. However, the engineer for the district admitted that the present district tile has a capacity of serving approximately 20 to 25 more acres, and that laying a 10-inch tile attached to the 27-inch tile would cure any difficulty with reference to the quarry water.

The master found that the defendant, Manteno Limestone Company, in the normal course of its operations removes surface and percolating waters from the quarry hole which are drained to a low area of defendant Montgomery's land, and confined in banks to prevent overflow on the adjoining lands; that the water so drained stands over the main drain of the district, and enters the drain, causing a periodic overload. The normal drainage of the lands of the individual plaintiffs is thereby retarded, and they are damaged by inability to cultivate their crops. The master therefore recommended that the defendants be enjoined from allowing the percolating waters of the quarry to enter the drains of the plaintiff district.

The court sustained some of defendants' objections to the master's report with reference to the individual plaintiffs. It found that a large portion of the percolating water from the stone quarry enters into the plaintiff's tiles; that the quarry may be operated for approximately 17 years in the future; and inasmuch as the amount of percolating waters will increase as the size of the pit increases, the drainage tiles eventually will be inadequate to carry the water both from the quarry and from the agricultural lands.

The court further found that the operation of the stone quarry did not fall within the definition of "mining" as provided in the Drainage and Levee Act, and that defendant consequently had no lawful right to use the drains of the district to discharge the percolating waters, but that because of its substantial investment and mistaken belief of right, defendant should be given a reasonable time within which to provide for the disposition of excess quarry water.

Upon the courts ruling that the evidence did not show overloading of the tiles, or overflowing or damage to the lands of the individual plaintiffs, they were dismissed and the complaint was thereafter amended. It was thereupon alleged that defendant, Manteno Limestone Company, was not engaged in mining within the purpose of the statute organizing the district, and that the plaintiff district suffered irreparable damage in that the capacity of its drains to perform as agricultural drains, for which they were designed and used for 20 years, is inadequate, or will be rendered inadequate, by reason of defendant's use. Plaintiff further alleged that inasmuch as the damage to the district and the landowners through the retardation of the agricultural activities is too indefinite to be computed, but nevertheless constitutes irreparable injury for which the plaintiff district is entitled to injunctive relief.

Defendant not only denied the allegations of the amended complaint, but stated that it had invested approximately $100,000 in the quarry, and that the issuance of an injunction would completely destroy its business, whereas the benefit to plaintiff, if any, would be slight.

The court thereupon permanently enjoined defendants from permitting any percolating water from the quarry to enter the plaintiff's drains.

On this appeal defendants maintain that the quarrying operations fall within the purpose of the statute

358

under which the district was organized, that they are entitled to reasonable drainage as owners of the lands and taxpayers within the district, and that plaintiff has shown no irreparable injury entitling it to injunctive relief.

Plaintiff, however, contends that defendant's operations do not fall within the statutory purpose, and even if they did, the rights of the landowners to drainage was fixed upon the organization of the district, and each landowner acquired a right in the nature of an easement to drain only so much water as might reasonably be contemplated from the use to which his lands were put at that time, hence, an attempt to introduce more than such quantity of water, whether by change in the use of the land, or otherwise, constitutes an unlawful attempt to expand such easement, and should be enjoined since the increased flowage reduces the efficiency of the tiles and may become the foundation of an adverse right.

██ The rights of landowners within a drainage district are subject to the provisions of the statute authorizing the construction of the drainage system, where they take advantage of such drainage facilities. (*Turley v. Arnold*, 384 Ill. 158.) Defendants' rights to use the drains herein are predicated upon the terms and provisions of the Drainage and Levee Act, *supra*. The Act is entitled "An Act to provide for the construction, reparation and protection of drains, ditches, and levees across the lands of others, for agricultural, sanitary, and mining purposes, and to provide for the organization of drainage districts."

Defendant insists, and plaintiff denies, that the operation of a limestone quarry constitutes "mining" within the purview of the statute. The term "mining" is not defined in the statute, nor in the case law construing the statute. The cases cited by plaintiff for its contention do not involve statutory constructions,

but refer only to reservations in deeds and leases involving mineral rights. (*People v. Bell,* 237 Ill. 332; *Kinder v. LaSalle County Carbon Coal Co.,* 310 Ill. 126.)

In the *Kinder* case, *supra,* the court, in construing a deed, was primarily seeking to ascertain the intention of the parties in defining the words. It held that where a deed conveyed to one party ''all the bituminous or stone coal together with the right to mine the same,'' and a subsequent deed conveyed part of the surface of the land but reserved ''all bituminous or stone coal and other minerals,'' the grantor did not intend by the first deed to convey the gravel and limestone which the parties knew could only be removed by destroying the surface of the land. This would have meant the destruction of the surface rights and all that the grantor expressly reserved and thereafter conveyed by the second deed and consequently contrary to the grantor's intention. The court predicated its decision on the further fact that the owner of the surface of the land had for more than 20 years extracted the limestone with the knowledge of the owner of the coal, and therefore had acquired certain rights of adverse possession.

This case is clearly not authority for concluding that the term ''mining'' in the Drainage and Levee Act excludes the quarrying of limestone, for not only is it predicated upon the intention of the parties, and rights of adverse possession, but it is contrary to the general rule that a conveyance or exception of ''minerals'' in a deed includes all mineral substances which can be taken from the land. (86 A. L. R. 984.)

█ By common usage the word ''mining'' has ceased to be confined to the extraction from the earth of metals and solid materials, and is now applied to all substances which are classified geologically as min-

360

erals, and ordinarily includes placer mining. (58 C. J. S. 35.) In 58 C. J. S. 36 it is stated:

"The term 'mining' has accommodated itself to a variety of situations. Originally it conveyed the idea of extracting minerals from the earth by means of tunneling and shafting, but in later times it has assumed a broader signification, and is not now limited in its meaning to the method of excavation, and as used in some connections includes open workings or quarries."

In construing the word "mining" in other statutes, courts have held that it included quarrying, and have rejected distinctions between classes of minerals and methods of working, stating that any attempt to distinguish between mining and quarrying would lead to no useful result. (*Burdick v. Dillon,* 144 Fed. 737, 741; *Arrel v. Gentsch,* 52 F. Supp. 635, 636.)

██ The purpose of the statute herein is to effectuate drainage for agricultural, sanitary and mining purposes, and it is immaterial whether the water entering the tiles comes from an above ground mining operation or from an underground shaft, for in both instances the drainage problem is substantially the same. Inasmuch as statutes should properly be construed according to their intent and meaning (*People v. Thillens,* 400 Ill. 224), it is our opinion, in the light of the remedial intent of the legislation, of improving the draining of all lands in the district (*People v. North Fork Outlet Drainage Dist.,* 331 Ill. 68), that the word "mining" should be construed in its general sense, and include the removal of limestone from defendant's quarry.

Plaintiff insists, however, that even if defendant's operations are under the Act, the drainage rights of the landowners were fixed upon the organization of the district, so that they had a right to drain only so much

water as might reasonably be contemplated from that use to which their lands were originally put. Hence, plaintiff argues, inasmuch as the lands in the district were used only for agricultural purposes at the time the drains were installed, that purpose cannot be changed so as to increase the flowage.

██ It is our judgment that the statute itself contemplated no such restriction. It is elementary that a statute must be construed in its entirety to properly deduce the legislative intention. In the Drainage and Levee Act, section 2, which authorizes the creation of drainage districts for agricultural, sanitary and mining purposes, must be particularly construed with section 37 and section 58 [Ill. Rev. Stat. 1949, ch. 42, pars. 2, 37, 56; Jones Ill. Stats. Ann. 42.007, 42.051, 42.072]. (*People v. Swearingen,* 273 Ill. 630.) Section 37 authorizes and establishes the procedure for affecting improvements necessary for the adequate drainage of the whole district. Section 58 provides for the organization of subdistricts whenever it appears that some portions only of the lands of the district are not sufficiently drained, and are in need of more minute and particular drainage. (*Sangamon & Drummer Drain. Dist. v. Illinois Cent. R. Co.,* 272 Ill. 374; *Freesen v. Scott County Drainage & Levee Dist.,* 283 Ill. 536.)

These sections would appear to indicate that the legislature envisaged that changes and improvements in the drains might become necessary, either for the benefit of the whole district, or of a particular area, and, therefore, endeavored to provide the procedure by which such improvements and additions could be made.

Such an interpretation is apparently sanctioned by the court in *Kohl v. Chouteau Island Drainage & Levee Dist.,* 283 Ill. 69, where the court, in construing section 58, held that it is not essential to the exercise of the powers of the drainage district, that all the powers

shall be exercised in the first instance. The court stated at p. 76:

"It is sufficient that the proper proceeding be taken for the organization of a district and drains or levees constructed, and it is not necessary that the district construct in the first instance drains or ditches which it deems unnecessary in order that it may retain the power to subsequently construct such drains or ditches as subsequent events may show are necessary to afford adequate protection to the lands from overflow or damage from water. To hold otherwise would be to require that every drainage district organized under this section must provide in the first instance for the construction on one or more main drains whether the same be deemed necessary or not in order that it might take advantage of the provisions of section 59 (58)."

In support of its contention that the rights of the landowners of the district were fixed upon the organization of the district, plaintiff cites *People v. North Fork Outlet Drainage Dist., supra.* The commissioners therein ordered an additional expansion in anticipation of the annexation of certain lands lying outside the district, and the court held that under section 58 the commissioners were without authority to construct a more extensive system of drainage than was necessary for the purpose of the district in anticipation of the annexation of other lands to the district.

The case does not prohibit any improvements or expansion within a district, nor hold that the commissioners cannot construct necessary additional drains where the landowners may be using the property differently than it was used at the time the district was organized. It merely prohibits construction in anticipation of the future annexation of lands lying outside the district, which situation is in no way involved in the instant case. Moreover, there is nothing therein inconsistent with the interpretation of the statute pre-

sented in the aforementioned *Kohl* case, *supra,* and a careful analysis of the two cases indicates that additions and improvements under section 58 must cope with existing drainage needs, and should not be anticipatory in scope. However, any such action will not preclude a subsequent exercise of the powers where events show the necessity for further construction.

■ Not only do the commissioners of a drainage district have authority to make additions and improvements of the original drainage system, but they are under a duty to enlarge the drains in order to provide proper drainage for the district. (*Binder v. Langhorst,* 234 Ill. 583.) In this case the commissioners were held liable for damages to a landowner for their neglect to enlarge the drain, the court stated that the obligations and powers of the commissioners were the same under the Levee Act as under the Farm Drainage Act, even though the language conferring authority is not the same. ''The duty is imperative.''

In *Stoddard v. Keefe,* 278 Ill. 512, the court, in construing the duties of the commissioners under the Farm Drainage Act, stated that the duties are continuing, and if the system of drainage adopted is not of sufficient capacity to afford proper drainage for all the lands of the district, the commissioner may be compelled to improve it.

It would appear, therefore, that there is nothing in the statute, nor in the interpretation thereof, which would restrict the drainage rights of the landowners to the installation which was necessary and appropriate at the time the district was organized.

The record herein does not show that the district was exclusively devoted to farming purposes at the time it was organized, or that the landowners intended thereafter to devote their lands exclusively to that purpose. On the contrary, it would appear that since the district was originally organized under the Farm

Drainage Act, and thereafter organized under the Levee Act, which is broader in scope, in that it authorizes the construction of drains for mining as well as agricultural purposes, the organizers specifically intended that mining purposes should be served by this particular drainage district.

Plaintiff insists, however, that since the property in this district was not used for mining purposes during the 25 years following its organization, the landowners and the district acquired a prescriptive right that it would thereafter be devoted exclusively to farming purposes. In support thereof, plaintiff relies principally upon *Barrington Hills Country Club v. Village of Barrington,* 357 Ill. 11 and *Kenilworth Sanitarium v. Village of Kenilworth,* 220 Ill. 264.

The *Barrington* case, *supra,* involved the rights of riparian owners to prohibit a city from increasing or polluting the water course by discharging sewage therein without compensation. It is clearly distinguishable from the case at bar on the grounds that there is no pollution herein, and that defendant is using the drains for one of the avowed purposes for which the drainage system was authorized and established.

The *Kenilworth* case, *supra,* also involved pollution, but of a mutual drainage ditch created for the sole purpose of draining surface waters. The court stated, in enjoining the acts of the sanitarium, that the statute authorizing the creation of mutual ditches, and the purpose for which it was continually used for 35 years, fixed the rights of the adjoining owners. The court also predicated its decision on the fact that if the sanitarium were permitted to empty its sewerage into the ditch, every other property owner along the mutual ditch would have the same right, and the ditch, instead of being an outlet for the lowlands, would become an open sewer.

██ The purpose of the statute under which that mutual ditch was created did not authorize defendant's discharge therein of "purified sewerage." In the instant case, however, not only is there no issue of pollution, but defendant's acts of draining the water from his quarrying operations were clearly within the statutory purpose for which the drainage district was established. It is apparent, therefore, that these cases are not determinative of the rights of the parties herein. Although the drains may possibly have been used for agricultural purposes during the 25 years following their construction, a prescriptive right should not be construed in derogation of the statute so as to render it at least partially nugatory. Therefore, the additional quantities of water introduced in the tiles should not be deemed to violate any prescriptive rights acquired by the plaintiff district.

It is undisputed that where a landowner has improperly connected into a drainage system, as in *King v. Manning,* 305 Ill. 31, where the defendant connected into a mutual drainage system without the consent of the other landowners, an injunction may issue to compel disconnection. However, defendant's rights to use the drains herein are not dependent upon the consent of the adjoining landowners, as under a mutual drainage system, but are determined by the statute under which the drainage district and system was established. As hereinbefore noted, defendant lawfully had a right to use the drains in connection with its mining operations, and the *Manning* case, is therefore, not applicable.

While plaintiff's original theory was that the waters of the defendant's quarry overflowed onto the other lands of the district, and increased the burden on the flowing capacity of the tiles, after the court sustained defendant's objections to the master's findings, and the individual plaintiffs were dismissed, the plaintiff

district proceeded upon the theory that the increased volume of water reduced the efficacy of the drains, constituted an attempt to enlarge the easement at the expense of other members, and may become the foundation of an adverse right.

The evidence touching the efficacy of the drains is controverted. However, there was testimony submitted by plaintiff's own witness that the present district tiles have a capacity to serve approximately 20 to 25 more acres. There is presently no overloading of the drains, no damage to the lands within the district, and at most only the potentiality that the quarry may, in response to a hypothetical question, be operated for approximately 17 more years, and the tiles in the future may become inadequate to carry the load because of the increased volume of water. It is submitted that when this situation occurs the commissioners will then be under a duty to proceed under the statute to construct a drainage system adequate to meet the needs of the district.

To authorize the issuance of an injunction there must be a clear and palpable violation of the rights of the complainants, as well as substantial injury resulting therefrom. (*Girard v. Lehigh Stone Co.,* 280 Ill. 479; *Haack v. Lindsay Light & Chemical Co.,* 393 Ill. 367.) An injunction will be denied where there is not a present danger, but one that may arise in the future. (*Springer v. Walters,* 139 Ill. 419.) In the *Springer* case the court denied the injunction where the complainants based their right to the injunction on the possibility that in the future there would be an overtaxing of the capacity of the sewer with consequent damage to plaintiff's land. The court stated at p. 423:

"It is not a present danger, but one that is apprehended will arise in the future from the admitting of drainage from within the district, when all the lots

367

within the district shall be occupied with buildings and the sewers shall be employed to the full extent of their capacity to remove the sewerage therefrom, and the street drainage, that is sought to be avoided. That is entirely too remote."

It is evident that if defendant is not permitted to use the drains its entire quarrying operations must be terminated and its business destroyed. This result should not be necessitated by the contingency that defendant may in the future increase the water flowing into the drainage tiles so that they may become inadequate to carry both the quarry and agricultural waters.

In the light of the analysis of the legal issues presented on this appeal, it is our opinion that the issuance of the injunction against the defendants in the instant case by the circuit court was in error, and that the decree should properly be reversed with directions to enter a decree in accordance with the views expressed herein.

*Judgment reversed and remanded with directions.*