[Civ. No. 3052. Fourth Dist. Mar. 30, 1943.]

THE STANDARD PIPE & SUPPLY COMPANY (a Corporation), Respondent, v. RED ROCK COMPANY, INC. (a Corporation) et al., Defendants; LIDA E. CROOKSHANK et al., Appellants.

R. M. Crookshank and Calvin H. Conron, Jr., for Appellants.

Raphael Dechter and B. L. Hoyt for Respondent.

MARKS, J.—This is an appeal by Lida E. and Conrad C. Crookshank from a judgment directing the foreclosure of a lien upon 630 acres of land in Kern County. We will hereafter refer to them as the defendants. The lien was claimed because plaintiff had furnished equipment and materials used in drilling a wildcat oil well. The well failed to produce.

Lida E. and Conrad C. Crookshank were the owners of

all of Section 13, except ten acres thereof, in Township 30 South, Range 37 East, and all of Section 19 in Township 30 South, Range 38 East, M. D. B. & M. in Kern County. Under date of February 15, 1940, they leased all of the property to J. E. Johnson for the purpose of drilling for oil. Johnson's interest passed to the Red Rock Company, Inc., which started drilling in July, 1940, and stopped on September 27, 1940.

Plaintiff rented drilling equipment to the Red Rock Company, Inc., and sold it materials which were used in the drilling operations. The total rental and sales value of the equipment and materials was $8,004.11, including some charges for telephone calls which were admittedly not lienable. Plaintiff was paid $1,722.99 on account, leaving an unpaid balance of $6,281.12. A claim of lien on section 13 for that amount was filed. This action was brought to foreclose that lien.

At the trial it was admitted that the charges for rental of the equipment after the drilling had stopped, and the charges for telephone calls made in an endeavor to collect the balance due, were not lienable items. (*Danaldson* v. *Orchard Crude Oil Co.*, 6 Cal.App. 641 [92 P. 1046].) Judgment was rendered against the Red Rock Company, Inc., for $6,281.12, and $1.50, costs of verifying and recording the lien, and a lien for the sum of $3,078.05 was decreed foreclosed on the 630 acres of land in section 13.

Defendants Crookshank have appealed from the judgment. They urge two grounds for its reversal: (1) That it was improper to declare a lien on the whole 630 acres of land, and, (2) that as $1,722.99 had been paid plaintiff in July, 1940, during the progress of the drilling operations, the lienable debt should have been reduced by that amount.

The first question does not seem to have been clearly decided in California under the lien law now in effect. It will be helpful to review the progress of the lien law appearing in sections 1183 and 1185 of the Code of Civil Procedure through the various amendments material here.

■ Section 15 of article XX of the state Constitution provides for mechanics', materialmen's and laborers' liens. It is settled that while this section creates a right, it is not self executing and is inoperative without legislation providing for the enforcement of that right.

Section 1183 of the Code of Civil Procedure, adopted in 1872, gave materialmen and laborers furnishing material

used in the construction, alteration or repair of any tunnel or mining claim, liens not exceeding in the aggregate an amount which the owner of the property would otherwise be liable to pay.

The first amendment important here was adopted in 1885 (Stats. 1885, p. 143) by adding to the section, "and any person who performs labor in any mining claim or claims, has a lien upon the same, and the works owned and used by the owners for reducing the ores from such mining claim or claims, for the work or labor done, or materials furnished by each respectively. . . . " The quoted clause was again amended in 1903 (Stats. 1903, p. 84) to read as follows: "And any person who performs labor in any mining claim or claims, or in or upon any real property worked as a mine . . . has a lien upon the same, and the works owned and used by the owners for reducing the ores from such mining claim or claims, or real property so worked as a mine, for the work or labor done or materials furnished by each respectively . . . ."

Other amendments do not materially affect the question before us. The material part of the section now reads:

"Any person who performs labor in any mining claim or claims, or in or upon any real property worked as a mine, either in the development thereof or in working thereon by the subtractive process or furnishes materials to be used or consumed therein, has a lien upon the same and the works owned and used by the owners for milling or reducing the ores from the same, for the value of the work or labor done or materials furnished by each respectively, whether done or furnished at the instance of the owner of such mining claim or claims or real property worked as a mine, or his agent . . . ."

Section 1185 of the Code of Civil Procedure was first adopted in 1872. None of its several amendments materially affect the question before us. It now reads:

"The land upon which any building, improvement, well or structure is constructed, together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof, to be determined by the court on rendering judgment, is also subject to the lien, if at the commencement of the work, or of the furnishing of the

material for the same, the land belonged to the person who caused said building, improvement, well or structure to be constructed, altered or repaired, but if such person owned less than fee-simple estate in such land, then only his interest therein is subject to such lien, except as provided in section 1192 of this code.''

Originally the law provided for liens upon two different kinds of property which were classified by the process of obtaining title. One was upon mining claims as they are technically described in the federal and state laws where possessory rights or title are obtained by discovery of minerals and location under the mining laws. The other was upon other classes of property where title is obtained by means other than under the mining laws. While in *Berentz* v. *Belmont Oil Mining Co.*, 148 Cal. 577 [84 P. 47, 113 Am.St.Rep. 308], it was held technically incorrect to refer to classes of liens, depending on the manner of obtaining title or possessory rights, we find that mode of expression convenient and will use it here. We will refer to liens on agricultural lands as meaning liens on lands not acquired under the mining laws, and to liens on mining claims as meaning liens on mineral lands acquired by mineral location under the mining laws.

Originally there were but two classes of liens in California. They were liens on agricultural lands and liens on mining claims. In describing the lienable lands in the two classifications in *California Corrugated C. Co.* v. *Stewart*, 215 Cal. 120 [8 P.2d 1013], it was said:

''The Mechanic's Lien Law provides for two distinct categories of liens. They are, first, liens for labor and materials employed or used in the construction of 'any building, wharf, bridge, ditch, flume, acqueduct, well,' etc., and, secondly, liens for labor and materials employed and used on mining claims. (Sec. 1183, Code Civ. Proc.) Section 1185 of the same code provides that 'the land upon which any building, improvement, well or structure is constructed, together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof, to be determined by the court on rendering judgment, is also subject to the lien.' In construing section 1185 it has been held uniformly with reference to the second category, that when the labor and materials are employed and used on a mining

claim, the mechanic's lien covers the entire mining claim. (*Williams* v. *Mountaineer G. M. Co.*, 102 Cal. 134 [34 P. 702, 36 P. 388]; *Berentz* v. *Belmont Oil Min. Co.*, 148 Cal. 577 [113 Am.St.Rep. 308, 84 P. 47].) In such cases no question of fact as to the extent of land required for the convenient use and occupation of structure or improvement is presented. As a matter of law the entire mining claim is subject to the lien.

"In connection with the first category of liens, when the land upon which the structure or improvement rests is a part of a larger parcel, a question of fact is presented as to what portion, if any, of such larger parcel is required for the convenient use and occupation of the structure or improvement. (*Western Well Works* v. *California F. Co.*, 60 Cal.App. 749 [214 P. 491].) This question of fact must be determined by the court upon the trial of the case." We can find no deviation from these rules as applied to the two classes of liens.

In 1903 a third type of lien was recognized by the statute. This was "in or upon any real property worked as a mine." Insofar as this language of the statute is concerned it would seem that this provision would permit liens on agricultural lands worked as a mine as well as upon mining claims as they are technically known. As the law, prior to the amendment, clearly provided for liens upon mining claims, and as some decisions seem to have held that the portion of agricultural lands which was worked as a mine was subject to a lien, and at least one other had held that it was not, the amendment would seem to have had as its purpose the clarification of the law so that laborers working on a mine located on agricultural lands could have a laborer's lien upon at least a portion of it to the value of the labor performed. (See, *Williams* v. *Santa Clara Mining Assn.*, 66 Cal. 193 [5 P. 85]; *Bewick* v. *Muir*, 83 Cal. 368 [23 P. 389]; *Morse* v. *De Ardo*, 107 Cal. 622 [40 P. 1018].) The judgment in the last cited case was explained in *Berentz* v. *Belmont Oil Mining Co.*, *supra*, as follows:

". . . but it was not there decided that ground actually worked as a mine within a larger tract of agricultural land was not subject to a lien as such. The judgment of the lower court decreeing a lien upon twenty-six out of nine

hundred and sixty acres of land, including the mining works, was reversed for want of a finding that the smaller tract was a mining claim."

Commencing in 1897 (Act Feb. 11, 1897, ch. 216, 29 Stats. 526, U. S. Comp. Stats. 1901, p. 1434), Congress provided that the acquisition and sale of oil lands forming part of the public domain should be governed by the federal laws applicable to the location and sale of placer mining claims. Since that time, and, down to the passage of the Leasing and Prospecting Act (30 U. S. C. A. 381, secs. 181, et seq.), the location and transfer of federal oil lands has been under the placer mining law. Since February 25, 1920, the right to drill on the federal domain has been governed by the Leasing and Prospecting Act. Under both of these acts the drilling for oil has been regarded as a placer mining operation. Also, in California, oil is recognized as a mineral (*Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871], and drilling for it is classified as a placer mining operation (*Berentz* v. *Belmont Oil Mining Co., supra*), although it has been held that drilling for oil does not come within the technical definition of "mining" as that word is used in section 2980 of the Civil Code. (*Cornwell* v. *Buck & Stoddard, Inc.*, 28 Cal.App.2d 333 [82 P.2d 516].)

Therefore, plaintiff's lien must rest upon the theory that it furnished equipment and materials which were used in a placer mining operation. This excludes from the case any consideration of a materialman's lien on a structure and the ground necessary for its convenient use when the structure is on agricultural land not worked as a mine.

There is no allegation in the complaint, and no finding to the effect that defendants acquired title to their property under the mining laws. There was no evidence offered on this question. There were 1,270 acres of land described in the lease, and 640 acres of land described in the claim of lien. As said in *Williams* v. *Santa Clara Mining Assn., supra*: "We take notice that no patent, based upon 'mining claims,' could have been issued under any act of Congress for the whole, or for eleven hundred and nine acres. . . ." The complaint in the instant case alleges that all of section 13 was necessary for the use and occupancy of the oil well. The trial court found this to be true, but ordered that sec-

tion 13, less the ten acres not owned by defendants, be sold. There is no evidence supporting this finding and none was offered on the question of the amount of land necessary for the use and occupation of the dry hole.

Had defendants' title been acquired through mining claims, such allegation and finding would have been unnecessary as all of a group of claims worked together as a mine are subject to lien. (*California Corrugated Culvert Co.* v. *Stewart, supra.*) Had defendants' title to the 1,270 acres leased for oil drilling been derived through mining claims and all of the leased property worked together as a mine, plaintiff's lien must fail because it filed its claim of lien on part of the property. (*Williams* v. *Mountaineer Gold Mining Co.*, 102 Cal. 134 [34 P. 702, 36 P. 388].)

If there is any inference to be drawn from this situation it should be to the effect that defendant's title does not rest on mining claims but rather that they own agricultural lands which they leased for drilling oil, a placer mining operation.

The earliest case we have found bearing on the question before us is *Williams* v. *Santa Clara Mining Assn., supra.* There, mining operations were conducted on a tract of 1,109.67 acres of agricultural land and 314.68 acres which had formerly been pueblo land belonging to the city of San Jose. Both tracts were owned by the Santa Clara Company. Plaintiff and his assignors performed labor on a mine on a portion of the properties and filed claims of lien on all of the two tracts. The trial court ordered the whole of the two tracts sold to satisfy the lien. In reversing this judgment it was said:

"The lands directed to be sold were not a 'mining claim,' either in the popular sense of the words, or as the term has been employed in judicial decisions, or as it is used in the code. The Fremont Grant is not a 'mining claim,' although many mines have been opened within its boundaries, and the owners of the grant may claim such mines to be their own. The right of the defendant, the Santa Clara Company, to a portion of the *Rancho Los Capitancillos,* or to a portion of the *Pueblo* lands of San Jose, and to extract ores therefrom, in no way depended upon a claim to the possession made in recognition of and in conformity to local rules adopted by miners of a mining district, or in accordance with the usages or customs of a locality. The defendant de-

rived its title, as would seem, from the Mexican or Spanish government to the larger tract; certainly so, as to the *Pueblo* land. We take notice that no patent, based upon 'mining claims,' could have been issued under any act of Congress for the whole, or for eleven hundred and nine acres, of the *Rancho Los Capitancillos*. The plaintiff could not acquire the statutory lien upon the lands of the Santa Clara Company, simply because the statute does not authorize it. It may be that the statute is not sufficiently comprehensive; indeed, it would, perhaps, be difficult to say why one class of 'material-men,' or laborers, should have preference over another; why, for instance, the furnisher of seed, or the plowman, should not have a lien on the farm of him to whom the seed is supplied, or for whom the plowing is done. But the legislature has seen fit to limit the benefit of the lien to particular classes, and we are not authorized to extend it to others.''

The foregoing decision was further explained in *Bewick* v. *Muir, supra,* where it was said:

''The decision in *Williams* v. *S. C. M. Ass'n.*, 66 Cal. 193 [5 P. 85], is not in conflict with this. Although there are some expressions in the opinion in that case which seem to countenance the opposite view, we think that what was decided was merely that the adjacent land, which the defendant held under a Spanish grant, was not mineral land, or appurtenant thereto. Such land was, therefore, not a mine or a mining claim in any sense, and consequently was not liable as such. If it shall turn out that some of the land involved here was of that character, then it is not liable.''

Plaintiff relies strongly upon the case of *Berentz* v. *Belmont Oil Mining Co., supra,* as supporting the judgment. There the Supreme Court affirmed a judgment foreclosing a lien upon eighty acres of land upon which an oil well had been drilled. The court gave the reasons for its decision as follows:

''The question, therefore, is whether this eighty-acre tract of land in process of development as an oil mine is a mining claim within the meaning of the lien law, and we think that in any view of the case this question must be answered in the affirmative. Under the act of Congress of 1897 (Act Feb. 11, 1897, ch. 216, 29 Stats. 526 [U. S. Comp. Stats. 1901, p. 1434]), the location and sale of oil land is governed by the

mineral laws of the United States applicable to the location and sale of placer mining claims, and if land is located and held under this law, it is a mining claim before patent in every sense of the word, and for the purpose of the lien law it does not cease to be a mining claim when, by a patent from the government, the fee is transferred to the locator or his assigns. This was clearly held in *Bewick* v. *Muir*, 83 Cal. [368] 372 [23 P. 389], and the authority of that decision has never been questioned.'' This is in accordance with a long, unbroken line of decisions which hold that where work is performed on a mining claim, or a group of claims worked as a mine, the laborer's lien attaches to the entire claim or group of claims and not merely to the ground actually worked.

Plaintiff relies strongly on the case of *Standard Pipe & Supply Co.* v. *Marvin*, 43 Cal.App.2d 230 [110 P.2d 476]. In that case certain of the defendants were adjoining owners of thirteen acres of land which they leased to defendant Marvin to be drilled for oil under a community lease. A dry hole resulted from the operations and plaintiff filed its lien on the thirteen acres which the trial court ordered sold to satisfy the debt. In approving that portion of the judgment the court said:

''Defendants further contend that 'The finding of the trial court that the whole of the 13 acre tract described in the consolidated decree herein is necessary for ''the convenient use and occupation'' of the ''dry hole'', ''found'' to have resulted from the deepening of the existing dry hole on said premises, is not supported by the evidence.' In our opinion the finding at which this contention is directed is an immaterial finding in this case. Under the evidence and findings, it is clear that the plaintiffs furnished materials for work done in the exploration for oil on the thirteen-acre tract, which tract was being worked by the lessee as a single development under a community lease covering the entire tract. The liens of plaintiffs were therefore liens for materials furnished to be used and consumed in the development of 'real property worked as a mine' within the meaning of the second paragraph of section 1183 of the Code of Civil Procedure and said liens extended to the entire tract. (*Berentz V. Belmont Oil Mining Co.*, 148 Cal. 577 [84 P. 47, 113 Am. St. Rep. 308].) As was said in *California Corrugated Culvert Co.* v. *Stewart*, 215 Cal. 120, at page 122 [8 P.2d 1013], 'In such cases no question of fact as to the extent of land required

for the convenient use and occupation of the structure or improvement is presented.' "

We are in accord with the ultimate conclusion reached in that case as all of the thirteen acres was worked as a mine. If, as we assume, the thirteen acres was agricultural land (which does not appear from the opinion) we cannot agree that the finding that all of the thirteen acres was necessary for the convenient use and occupation of the dry hole was immaterial. The cases cited do not support that conclusion. *Berentz* v. *Belmont Oil Mining Co., supra,* dealt with eighty acres of land which formed what is technically known as a mining claim. Therefore, all of the claim was subject to the lien and not merely the portion necessary for the convenient use and occupation of the improvement. The quotation from *California Corrugated Culvert Co.* v. *Stewart, supra,* is taken from the portion of the opinion discussing liens on technical mining claims which we have already quoted. It is clearly not applicable in a case where a lien is claimed on a mine situated on agricultural land.

The last case necessary for us to notice is *Gregg* v. *H. & M. Drilling Co.,* 92 Cal.App. 189 [267 P. 903]. The individual defendants were the owners of twenty-four acres of presumably agricultural land. They leased the entire tract to one Daynes for oil development purposes who in turn leased a portion of the tract (probably five acres) to the H. & M. Drilling Company which secured permission from the owners to use a strip of land along the north boundary of the twenty-four acres as a driveway reaching from a public road to the five acres upon which it was proposed to drill. Plaintiff furnished gravel for this driveway to the H. & M. Drilling Company and filed a lien on the twenty-four acres for his bill. The trial court ordered the five acres, and the ground occupied by the driveway, sold to satisfy the lien. The appellate court reversed the judgment, holding that only the land occupied by the driveway, and sufficient ground for turning space on the five acres, could be subjected to the lien.

These authorities have caused us to reach the conclusion that since it was not alleged, proved and found that the property of defendants was a mining claim or a group of mining claims, operated as one mine, as those terms are defined in the decisions, and as there is no evidence supporting the finding that the 630 acres are necessary for the convenient use of the dry oil well, the judgment cannot be allowed to stand. If the defendants' property is agricultural land plaintiff is

entitled to its lien on the dry hole "together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof, to be determined by the court on rendering judgment." (Sec. 1185, Code Civ. Proc.)

The lease indicates that the parties to it did not regard the entire property as a single tract to be developed by one mining operation. It was provided that "for the purpose of this drilling requirement the land shall be divided into 10 acre parcels by lines running north and south and east and west, each 10 acres to be as nearly square in shape as possible. It is intended hereby that the Lessee shall eventually (keeping at least one string of tools drilling at all times, but allowing said ninety [90] days interval between wells) drill the same number of wells to each distinct oil zone, provided however, that after one well on every 10 acres shall have been drilled by Lessee regardless of the zones to which said wells may be drilled, the Lessee shall not be required to drill any additional wells."

This provision would indicate that the parties to the lease believed that, if oil were discovered, ten acres of land was sufficient for the operation of each producing well and that sixty-three wells might have to be drilled.

The question of credits on the lienable debt, raised by defendants, would seem to have some merit. The payments were made in July during the progress of the drilling which was suspended on September 27th. Ordinarily such credits would be applied on the first items of the account. Plaintiff urges that this question was waived at the trial.

The record shows that counsel for plaintiff offered to stipulate, and asked counsel for defendants to stipulate, that the lienable items of the bill amounted to $3,078.05. While counsel for defendants did not join in this stipulation the trial court evidently acted on it as though they had done so. As the judgment must be reversed this matter may be left to be determined at a future trial.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 27, 1943. Traynor, J., voted for a hearing.