S. Benjamin Bryant, Asst. U.S. Atty., Huntington, W.Va., for plaintiff.

Carl Fletcher, Charleston, W.Va., for defendant.

**UNITED STATES of America, Plaintiff,**

v.

**H.G.D. & J. MINING COMPANY, INC., a corporation, Defendant.**

**C.A. No. 80–3187.**

United States District Court,
S.D. West Virginia,
Huntington Division.

April 1, 1983.

## MEMORANDUM OPINION

STAKER, District Judge.

Plaintiff, the United States of America, acting at the request of its Secretary of the Interior (Secretary), filed complaint herein alleging that during certain quarters of the years 1977 and 1978, the defendant, H.G.D. & J. Mining Company, Inc., operated in Lincoln County, West Virginia, in this District, a surface coal mining and reclamation operation that was subject to the provisions of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201, et seq. (the Act), and in so doing produced 16,173.55 tons of coal in respect to which the defendant became and was obligated to pay to the Secretary reclamation fees amounting to $5,660.74, plus statutory interest, pursuant to the provisions of 30 U.S.C. § 1232(a) and (e),[1] which defendant had refused to pay, although requested by

---

1. 30 U.S.C. § 1232(a) and (e) respectively provide:

   (a) All operators of coal mining operations subject to the provisions of this chapter shall pay to the Secretary of the Interior, for deposit in the fund, a reclamation fee of 35 cents per ton of coal produced by surface coal mining and 15 cents per ton of coal produced by underground mining or 10 per centum of the value of the coal at the mine, as determined by the Secretary, whichever is less, except that the reclamation fee for lignite coal shall be at a rate of 2 per centum of the value of the coal at the mine, or 10 cents per ton, whichever is less.

   (e) Any portion of the reclamation fee not properly or promptly paid pursuant to this section shall be recoverable, with statutory interest, from coal mine operators, in any court of competent jurisdiction in any action at law to compel payment of debts.

**316**

the Secretary to do so, and for which plaintiff demanded judgment.

Defendant answered and, in substance, admitted that it "dredged" 16,173.55 tons of coal from the site and during the quarters as alleged in the complaint, but denied that any reclamation fees were owing to the Secretary in virtue of its having done so, and defensively averred that the court lacks jurisdiction over defendant in this action for the reason that the coal involved here was not produced by defendant's having operated any "surface mining and reclamation operation or other coal mining operation" within the meaning of those terms as defined by the Act, but was rather produced by defendant's having operated a "dredging operation," which defendant averred was not an activity that was subject to the provisions of the Act. Defendant also defensively averred that its dredging of such coal for commercial purposes affected two acres or less,[2] for which reason the provisions of the Act were not applicable thereto.

Thus the basic issue here is whether, as a matter of law, the defendant, by dredging the coal involved from the river in the manner as shown by the parties' factual stipulations hereinafter set forth, was within the class of "[a]ll operators of coal mining operations subject to the provisions of . . ." the Act, as provided in 30 U.S.C. § 1232(a).

The parties entered into a stipulation of facts, and filed their respective memorandums of law, bearing upon that issue, defendant's memorandum having been accompanied by defendant's Motion for Summary Judgment, and the parties then submitted the case for decision by this court.

Those facts, as so stipulated, are quoted in the following numbered paragraphs 1 through 12:

STIPULATION OF FACTS

1. H.G.D. & J. Mining Company, Inc., is a West Virginia corporation.

2. Defendant H.G.D. & J. Mining Company, Inc. (H.G.D. & J.) at all times relevant to this action engaged in a coal dredging operation on the Guyandotte River near Hamlin, Lincoln County, West Virginia, the products of which enter into interstate commerce.

3. The H.G.D. & J. coal dredging operation is conducted, first, by making an excavation into the natural river bottom. The cut into the river bottom creates a depression or hole approximately 15 feet deep and 200 yards long, the purpose of which is to obtain coal by creating a settling basin to intercept coal washed out of upstream coal loading or mining operations, abandoned coal mines or exposed coal seams. The Guyandotte River is naturally approximately 4 feet deep in the area where the H.G.D. & J. coal dredging operation is located.

4. A cutter operating from a barge floating above the settling basin is used to churn up the newly deposited coal and debris whereupon it is pumped through pipes to a cleaning plant located at or near the dredging site on the banks of the Guyandotte River. The coal is physically treated to remove impurities and transported by truck approximately .6 mile down river to a coal loading facility where the coal is loaded into railroad cars for shipment to the commercial or industrial purchaser.

5. The land over which the Guyandotte River flows and the river itself are regulated by the State of West Virginia and the U.S. Army Corps of Engineers. By License Agreement dated February 3, 1955, between the Public Land Corporation of West Virginia, a Public Land Corporation of

---

**2.** 30 U.S.C. § 1278 provides:

The provisions of this chapter shall not apply to any of the following activities:

(1) the extraction of coal by a landowner for his own noncommercial use from land owned or leased by him;

(2) the extraction of coal for commercial purposes where the surface mining operation affects two acres or less; and

(3) the extraction of coal as an incidental part of Federal, State or local government-financed highway or other construction under regulations established by the regulatory authority.

West Virginia, and H.G.D. & J. Mining Company, Inc., the H.G.D. & J. Mining Company, Inc., is granted title to usable and merchantable sand, gravel or coal dredged, excavated or removed from the bed of the Guyandotte River beginning at the mouth of Ranger Branch, a point approximately 1.5 miles below the town of Ranger, Lincoln County, West Virginia, and extending 10 miles downstream of the Guyandotte River to the vicinity of Sheridan, Lincoln County, West Virginia. By License Agreement dated June 1, 1978, between the Public Land Corporation of West Virginia, a Public Land Corporation of West Virginia, and H.G.D. & J. Mining Company, Inc., the H.G.D. & J. Mining Company, Inc., is granted title to said usable and merchantable sand, gravel or coal when so dredged, excavated or removed from the bed of the Guyandotte River beginning at mile point 32.5, in the vicinity of Sheridan, Lincoln County, West Virginia, and extending downstream to the junction of said Guyandotte River and Ohio River at Huntington, Cabell County, West Virginia. The approximate distance from Sheridan, Lincoln County, West Virginia to the junction of the Guyandotte River and the Ohio River at Huntington, Cabell County, West Virginia is 40 miles.

6. H.G.D. & J. has obtained from the United States Army Corps of Engineers a valid permit for the aforesaid river dredging operation. H.G.D. & J. has not obtained surface mining permits for its aforesaid operation under either West Virginia or federal statutes and regulations pertaining to surface mining activities, but has obtained from the West Virginia Department of Natural Resources, Water Resources Division, a valid permit for its river dredging operation on the Guyandotte River.

7. H.G.D. & J.'s operation does not involve extracting coal from any deposit in its original geological location in the stream bed of the Guyandotte River.

8. H.G.D. & J.'s operation dredges coal commercially for sale on the open market.

9. H.G.D. & J.'s aforesaid operation dredged a total of 16,173.65 tons of coal during the fourth calendar quarter of 1977, the second, third and fourth calendar quarters of 1978, and the first and second calendar quarters of 1979.

10. The reclamation fee appropriate for 16,173.65 tons of coal produced in an operation subject to the Surface Mining Control and Reclamation Act of 1977 is Five Thousand Six Hundred Sixty Dollars and Seventy-Four Cents ($5,660.74).

11. H.G.D. & J. received a letter from Mr. Jake Vassel of the Office of Surface Mining, dated December 4, 1978, demanding payment of reclamation fees in the amount of Four Thousand Four Hundred Seventy-Three Dollars ($4,473.00), plus interest at one percent (1%) per month. No other letters demanding payment were received by H.G.D. & J.

12. H.G.D. & J. has not paid to the Secretary of the Interior the sum of Five Thousand Six Hundred Sixty Dollars and Seventy-Four Cents ($5,660.74) in reclamation fees, nor any other amount, on the coal dredged by its operation on the Guyandotte River.

## CONCLUSIONS OF LAW

This court has jurisdiction of this cause pursuant to 30 U.S.C. § 1232(e) and 28 U.S.C. § 1345.[3]

The language, tenor and stated purpose of the Act[4] manifest an intent by the Con-

---

3. 28 U.S.C. § 1345 provides:

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress. .

4. That purpose as stated in part in 30 U.S.C. § 1202(a) and (h), is to:

(a) establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations;
[and]

(h) promote the reclamation of mined areas left without adequate reclamation prior to August 3, 1977, and which continue, in

gress thereby to create and implement a comprehensive and broadly remedial statutory scheme calculated to enable reclamation efforts to be carried out to alleviate the adverse effects to the environment caused by coal mining operations conducted before August 3, 1977, the Act's effective date, and to regulate those conducted after that date in a manner designed to reduce like effects that would result therefrom. To that end, the provisions of 30 U.S.C. § 1232(a) require "operators of coal mining operations" to pay a fee based upon tons of coal produced by them after that date, into a fund from which those reclamation efforts were to be financed, thus placing upon the coal mining industry, and ultimately upon the consuming public, the burden of financing those reclamation efforts.

Defendant contends, in substance, that 30 U.S.C. § 1232(a) provides that the reclamation fee is to be paid by "all operators of coal mining operations subject to the provisions of the" Act, and that defendant's activity of dredging coal from the river did not constitute defendant the operator of "coal mining operations subject to the provisions of the" Act, because

(a) as defined by the Act, 30 U.S.C. § 1291(28),[5] "surface coal mining operations" are "activities conducted *on the surface of lands in connection with a surface coal mine*," etc., and the word "dredging" is not mentioned in that definition nor is there any language in that definition from which one could infer that river dredging operations are included therein;

(b) the language of that definition plainly and unambiguously states that surface coal mining operations are "activities conducted *on the surface of lands*" when defendant's dredging operation is not so conducted; and

(c) that definition covers "activities conducted on the surface of lands *in connection with a surface coal mine*," when defendant's dredging operation is neither a surface coal mine nor conducted in connection with a surface coal mine.

Defendant's assertion that the Act makes no mention of "dredging" is correct; however, in this court's view, defendant's contentions that the definition of "surface coal mining operations" set forth in 30 U.S.C. § 1291(28) contains no language from which one could infer that river dredging operations are included in that definition and that defendant's river dredging operation is neither conducted "on the surface of

their unreclaimed conditions, to substantially degrade the quality of the environment, prevent or damage the beneficial use of land or water resources, or endanger the health or safety of the public . . .

5. 30 U.S.C. § 1291(28) provides:
(28) "surface coal mining operations" means—
(A) activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of section 1266 of this title surface coal mining operations and surface impacts incident to an underground coal mine, the products of which enter commerce or the operations of which directly or indirectly affect interstate commerce. Such activities include excavation for the purpose of obtaining coal including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining, the uses of explosives and blasting, and in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal for interstate commerce at or near the mine site: *Provided,*

*however,* That such activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16⅔ per centum of the tonnage of minerals removed for purposes of commercial use or sale or coal explorations subject to section 1262 of this title; and
(B) the areas upon which such activities occur or where such activities disturb the natural land surface. Such areas shall also include any adjacent land the use of which is incidental to any such activities, all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of such activities and for haulage, and excavations, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to such activities; . . .

lands," nor conducted in connection with a surface coal mine, are not well taken.

Defendant insists that the Act's provisions are unambiguous and that, properly construed, they exclude the activity of dredging coal from a river from those activities made subject thereto.

In the court's view, the Act's provisions are indeed unambiguous, but a proper construction thereof leads to a result contrary to that urged by defendant.

In *N.L.R.B. v. Amax Coal Co.,* 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981), the Court said:

> Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.

In *Matala v. Consolidation Coal Co.,* 647 F.2d 427, 429 (4th Cir.1981), the court said:

> When we are faced with a question of statutory interpretation, our starting point for discerning congressional intent is the language of the statute itself. *State Water Control Board v. Train,* 559 F.2d 921, 924–25 n. 20 (4th Cir.1977). Congress is presumed to have used words according to their ordinary meaning unless a different use is clearly indicated. *United States v. Snider,* 502 F.2d 645 (4th Cir.1974).

Substantially the same language was used in *Diamond v. Chakrabarty,* 447 U.S. 303, 308, 100 S.Ct. 2204, 2207, 65 L.Ed.2d 144 (1980), where the Court said:

> In cases of statutory construction we begin, of course, with the language of the statute. *Southeastern Community College v. Davis,* 442 U.S. 397, 405 [99 S.Ct. 2361, 2366, 60 L.Ed.2d 980] (1979). And "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42 [100 S.Ct. 311, 314, 62 L.Ed.2d 199] (1979).

and said further,

> Broad general language is not necessarily ambiguous when congressional objectives require broad terms. *Id.,* at 315, 100 S.Ct. at 2211.

While "surface coal mining operations" are defined in 30 U.S.C. § 1291(28), the Act does not define the terms "mine" nor "mining." It is thus appropriate to ascertain whether those terms have an ordinary, contemporary, common meaning as well as a settled meaning under the common law.

Those terms have been defined in the following cases:

*Atlas Milling Co. v. Jones,* 115 F.2d 61, 63 (10th Cir.1940):

> A "mine" is an excavation in the earth from which ores, coal, or other mineral substances are removed by digging or other mining methods. In its broader sense it denotes the vein, lode, or deposit of minerals. Mining connotes the removal of minerals from a natural deposit. It does not embrace the re-working of mineral dumps *artificially* deposited from the residue remaining after the ore has been milled and concentrates removed therefrom: *South Utah Mines & Smelters v. Beaver County,* 262 U.S. 325, 332, 43 S.Ct. 577, 579, 67 L.Ed. 1004. [1923]. (Emphasis supplied.)

*Marvel v. Merritt,* 116 U.S. 11, 12, 6 S.Ct. 207, 29 L.Ed. 550 (1885):

> The word *mineral* is evidently derived from *mine,* as being that which is usually obtained from a *mine;* and accordingly Webster defines the latter as "a pit or excavation in the earth from which metallic ores or *other mineral substances* are taken by digging, distinguished from the pits from which stones only are taken and which are called quarries."

*Groves v. Terrace Mining Co.,* 340 S.W.2d 708, 711 (Mo.1960):

> The word "mines" is not a definite term, but its meaning must be determined from the circumstances of its use. In a "broad or enlarged sense," the term "mine" denotes the vein, lode, or deposit of mineral, and is also used to denote the place where, or the parcel of land on which, such mineral vein or deposit is found. In

this sense it is a certain part of the soil or of the earth's surface in which there are mineral deposits and in which a person may obtain not only a full right of ownership of the soil, but a right to remove the minerals therefrom and to dispose of them. 58 CJS Mines and Minerals § 1a; *Jones v. Vermont Asbestos Corporation,* 108 Vt 79, 182 A 291; *Ozark Chemical Co. v. Jones,* 10 Cir, 125 F2d 1; *People v. Silver,* 16 Cal2d 714, 108 P2d 4. However, in its "primary and restricted meaning" it usually refers to underground excavations and open workings where minerals or deposits are obtained. 58 CJS Mines and Minerals § 1b; *Certain-Teed Products Corporation v. Comly,* 54 Wyo 79, 87 P2d 21.

*In re Great Western Petroleum Corporation,* 16 F.Supp. 247, 249–250 (S.D.Cal.1936):

By common usage, the word "mining" has thus ceased to be confined to the extraction by excavation from the earth of metals and solid minerals. It is now applied to the extraction from the earth of all substances which are classified geologically as "minerals." It is true that in interpreting words in legislative enactments, the scientific meaning of a term is not the criterion, but the sense in which it is used in everyday life. See *United States v. Bhagat Singh Thind* (1923) 261 U.S. 204, 43 S.Ct. 338, 67 L.Ed. 616. But oil is *now* so generally considered a mineral and the extraction of oil is *now* so generally considered as mining, that we must assume that the California Legislature of 1933, in using the word "mining" in the section, used it in the sense in which that word had come to be used *at that time* and not in the sense in which a similar word might have been used by the California Legislature of 1872. Language is a democratic and popular process. Usage determines meaning. And the history of the English language is replete with illustrations of words the meaning of which has either been enlarged or entirely changed in the course of a few decades. Courts must bear this in mind in endeavoring to interpret words used in legislative enactments.

*Union Drainage Dist. No. 6 v. Manteno Limestone Co.,* 341 Ill.App. 353, 93 N.E.2d 500, 503 (Ill.1950):

By common usage the word "mining" has ceased to be confined to the extraction from the earth of metals and solid materials, and is now applied to all substances which are classified geologically as minerals, and ordinarily includes placer mining. (58 C.J.S., Mines & Minerals, § 3, p. 35.) In 58 C.J.S., Mines & Minerals, § 3, p. 36 it is stated: "The term 'mining,' * * * has accommodated itself to a variety of situations. Originally it conveyed the idea of extracting minerals from the earth by means of tunnelling and shafting, but in later times it has assumed a broader signification, and is not now limited in its meaning to the method of excavation, and, as used in some connections, includes open workings or quarries."

*Ingle v. City of Fulton,* 268 S.W.2d 600, 604 (Mo.1954):

The term "mining" is a broad term and may apply to various methods of extracting natural products from beneath the soil. "Hydraulic mining" is done by application of water pressure; "Strip Mining" is the removal of the surface above the seam or other deposits sought to be extracted. Other mining operations include tunnelling, blasting, excavations, etc.

43 C.F.R. § 3812.1 provides in part:

Whatever is recognized as a mineral by the standard authorities, whether metallic or other substance, when found in public lands [lands owned by the United States] in quantity and quality sufficient to render the lands valuable on account thereof, is treated as coming within the purview of the mining laws [of the United States].

"Placer mining" is itself a form of surface mining. In *Gregory v. Pershbaker,* 73 Cal. 109, 14 P. 401, 402 (Cal.1887) the court said:

A "placer" is defined: "A gravelly place where gold is found, especially by

the side of a river, or in the bed of a mountain torrent."

In *Reynolds v. Iron Silver Mining Co.,* 116 U.S. 687, 695, 6 S.Ct. 601, 605, 29 L.Ed. 774 (1886), the Court said: "[p]lacer mines ... are those in which ... [the] mineral is generally found in the softer material which covers the earth's surface, and not among the rocks beneath." [6]

From the foregoing, it is clear that the term "mine" is not a definite term, but depends for its meaning upon the circumstances of its use, but that in contemporary, common usage, as well as in its settled meaning under the common law, the term "mining" broadly means and includes all processes by which "minerals"—as distinct from earthen substances such as common stone, gravel, etc.—and particularly minerals occurring in a solid or particulate state,[7] are extracted from the earth by any process or method.[8]

Indeed, examination of the pertinent cases reveals that in almost all instances in which the courts have been called upon to decide the ultimate issue of whether a given activity involving the extraction of a nonliquid substance from the earth did or did not constitute "mining," that issue arose out of, and its resolution depended upon the court's having to decide, a dispute over the underlying question of whether the law recognized the substance involved in the extraction to be a "mineral," or rather a common earthen substance. Seldom have the courts had to decide whether the process or meth-

---

**6.** Pertinent to the common meaning and usage of the term "mining," as it relates to and includes the extraction of minerals by the "dredging" method of mining, is the following language appearing in 12 *Encyclopedia Britannica,* Mining and Quarrying, at 255 (15th Ed., 1979):

> Some valuable minerals, such as gold and cassiterite (tin mineral), are found in gravel deposits, where they have been deposited after being eroded from their place in primary deposits. Deposits of this type (placer deposits) are often exploited by dredges or hydraulic mining, as is overburden over iron-ore deposits in some countries.
>
> A dredge is a floating barge .... [Dredges] are operated either in a pond in a gravel deposit (California, Malaysia) or offshore (Indonesia and the Philippines). *Mined materials* are screened and the valuable minerals recovered by washing the finer gravel over riffles, grooved sluices, where the heavy minerals settle out by gravity.
>
> Hydraulic mining consists of washing the material from its position by a large stream of water under high pressure from a large nozzle (known as a hydraulic giant). *It is used for mining terrace placer deposits that cannot be mined by dredging or other means*
> . . . . .
>   . . . .
> Offshore operations include mining of gold in Alaska, tin-bearing sands off the coast of Thailand, tin off the shores of the Indonesia island of Sumatra, iron sands off the southwestern tip of Kyushu Island (Japan), cement sands (shell) west of Akranes (Iceland), and gravel from the English Channel. (Emphasis supplied).

**7.** Minerals occurring in other than a solid or particulate state may be "mined." Some courts have held oil wells to be "mines" and the drilling for oil to be "mining." See, e.g.,

*Mid-Northern Oil Co. v. Walker,* 65 Mont. 414, 211 P. 353 (Mont.1922); *Rice Oil Co. v. Toole County,* 86 Mont. 427, 284 P. 145 (Mont.1930); *Shell Petroleum Corporation v. Caudle,* 63 F.2d 296 (5th Cir.1933); *Standard Pipe & Supply Co. v. Red Rock Co.,* 57 Cal.App.2d 897, 135 P.2d 659 (Cal.1943). Other courts have held the contrary. See, e.g., *Kreps v. Brady,* 37 Okl. 754, 133 P. 216 (Okl.1912); *Carter Oil Co. v. Blair,* 256 Ala. 650, 57 So.2d 64 (Ala.1952).

**8.** As mindful as the court is that it is the common and ordinary, rather than any technical, usage and meaning that is to be ascribed to the words of a statute for the purpose of discerning its meaning and the intent of those who enacted it, it is nevertheless not inapposite to point out that mining engineers themselves deem the extraction of minerals from the earth by the dredging method to constitute "surface mining," and they so classify it, as attested by the following:

> "Placer mining of gold and heavy-mineral bearing sands ... [by] the technology of dredging is unique among *surface mining methods.*" (Emphasis supplied.) The American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., *Surface Mining,* at 4 (1st Ed., 1968).
>
> "Dredging is the underwater excavation of a placer deposit of detritus-type rock material. *For this mining method,* the deposit usually is low-grade and large in both area extent and thickness. The deposit may be an active or extinct stream or river bed." (Emphasis supplied.) Society of Mining Engineers of the American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc.[1] *SME Mining Engineering Handbook,* at 9–4 (1973).

od used to effect the extraction of a nonliquid substance did or did not constitute "mining."

The essential difference between the terms "underground mining" and "surface mining," as those terms are commonly understood, appears to be that in underground mining one or more persons—working miners—are required to go underground to mine the mineral involved, while in surface mining no person is required to do so. This concept—as well as the concept that mining is commonly understood to comprehend the removal from the earth of minerals in a solid or particulate state—are incorporated into the Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C. §§ 801, et seq. In 30 U.S.C. § 802(h)(1), "coal or other mine" is defined to mean "an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground . . . ."

Defendant's contentions become demonstrably unsupportable when the provisions of the Act, and more particularly those of 30 U.S.C. § 1291(28), are construed in the light of the foregoing authorities and are applied to the facts here.

Defendant's dredging operation was conducted at a place where, and upon a parcel of land from which, coal, a mineral, was found and extracted from the earth by excavating in the bed of the river, all of which was conducted from the earth's surface, and without any person's being required to work underground to do so. It was thus a "surface coal mine," and it clearly was a "surface coal mining operation" within the definition of that phrase, as set forth in 30 U.S.C. § 1291(28)(A), in that it was an "activity" that was "conducted on the surface of lands [more about which below] in connection with a surface coal mine," and it "included excavation for the purpose of obtaining coal."

While it is true that the statutory definition goes on to read, "including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining," and that the "dredging" method does not appear among those methods expressly therein so listed, there is a recognized rule of statutory construction which says that the use of the word "including" in a statute indicates that the specified list which follows that word therein is illustrative, and not inclusive, *Puerto Rico Maritime Shipping Authority v. I.C.C.*, 645 F.2d 1102 (D.C.Cir.1981), for which reason the "dredging" method is not excluded from that definition. The reasonableness of that construction and interpretation here accorded the word "including" and the list which follows it in that definition is reinforced when that definition is read *pari materia* with 30 U.S.C. § 1278, which clearly provides that the provisions of the Act shall not apply to "activities" consisting of the extraction of coal in only the three limited instances therein specifically enumerated.

Defendant asserts that its dredging operations are not "activities conducted *on* the *surface of lands*," wherefore those operations are not "activities" within the definition of "surface coal mining operations."

The term "surface lands" is not defined by the Act, however the provisions of 30 U.S.C. § 1291(4), (9) and (11), respectively defining "Federal lands" to mean "any land, including mineral interests, owned by the United States," etc., "Indian lands" to mean "all lands, including mineral interests, within the exterior boundaries of any Federal Indian Reservation," etc., and "lands within any State" or "lands within such State" to mean "all lands within a State other than Federal lands and Indian lands," casts some light upon the meaning of "lands" as used in the Act. Obviously the word "lands," as used in these three definitions means the surface of the earth, including the waters thereon, in the areas described in those definitions, else all lands within a Federal Indian Reservation's exterior boundaries would be subject to the provisions of the act, but the waters within those boundaries would not be so subject, and the same would hold true as to the lands within any State. Such an absurd result could not have been intended, particularly since one of the purposes of the Act was to reclaim waterways despoiled by coal mining prior to

the Act's effective date and prevent despoliation resulting therefrom after that date. The term "surface lands," as used in the Act, clearly means the surface of the earth, including the waters thereon, to distinguish "surface coal mining operations" from the underground ones. Thus, defendant's dredging operations were activities conducted on the surface of lands from whence defendant extracted coal.

And 30 U.S.C. § 1291(28)(A) goes on still further to define the "activities" therein mentioned to include "the cleaning . . . or other processing and preparation, [and] loading of coal for interstate commerce at or near the mine site," which language includes defendant's activities of physically treating the coal to remove impurities and transporting it by truck approximately .6 miles down river to a coal loading facility where it is loaded into railroad cars for shipment to the commercial or industrial purchaser, as stipulated in the above stipulations of facts.

And finally 30 U.S.C. § 1291(28)(B) provides, in substance, that "surface coal mining operations" means the areas upon which such "activities" occur or where they disturb the natural land surface and also include the use of adjacent land incidental to those activities, lands effected by the construction of new, or the improvement or use of existing, access roads to the site of those activities, and for haulage, workings, processing areas, and other areas upon which are sited structures, facilities or other property or materials on the surface, resulting from or incident to such activities. Certainly this language specifically describes defendant's operation of the cleaning plant on the banks of the river at or near the dredging site and the use of the access roads

thereto, etc., as also above factually stipulated. And the court would point out that those facilities of a certainty are situated on "lands."

The method by which defendant extracted the coal by dredging, as well as the sources of that coal and the manner in which it was carried by the action of the waters of the river and came to be deposited in the river bed at the site from which defendant dredged it, as shown in the above stipulation of facts, makes defendant's method of mining by dredging akin to "placer mining," a method of "surface mining."

Placer minerals are carried by water from the "mother lode" and deposited downstream therefrom in the gravel and other detritus from which deposits placer mining is carried on. Exactly the same is true with respect to the coal that was being mined by defendant here, except that in the traditional placer deposit the mineral deposited is generally deemed to have been extracted from the mother lode by the forces of nature, while here at least some of the coal deposited in the deposit being worked by defendant was artificially extracted from the "mother lodes," that is, from different upriver coal seams, by the action of men and machinery conducting upriver coal mining operations.[9] Nevertheless, most of the coal which ultimately came to be deposited at defendant's dredging site, while once personal property in virtue of its having been theretofore severed from the realty, *Atlas Milling Co. v. Jones,* 115 F.2d 61 (10th Cir.1940), was not retained in any refuse bank or other such formation located at or near the site at which it was so severed, but rather was returned to the earth, having lost its identity as personalty and having

---

9. The court would further point out that lest we in the "effete East" parochially deem the concept and term "placer mining" not to have a truly demotic meaning, usage and understanding, let us take note that that method of mining far antedates the relatively recently adopted strip, auger, mountaintop removal and other surface mining methods, all of which made their advent contemporaneously with the development and manufacture of the heavy earth moving machinery necessary for their prosecution, and that the Act is effective nationwide, not only in the eastern portion of the nation where placer mining is rare, but also in the far west where it has been fairly widely

again become a mineral free in nature.[10] For that reason, that defendant's operation did not involve the extraction of the coal from any natural seam is no impediment to defendant's being classed as an operator of a surface coal mining operation. Moreover, it is factually stipulated that defendant made an excavation into the river bottom at the site of the dredging operation the purpose of which was to obtain coal by creating a settling basin "to intercept coal washed out of upstream coal loading or mining operations, abandoned coal mines or *exposed coal seams.*" Such of that as was washed from exposed coal seams and intercepted and mined by defendant's dredge certainly was in its natural mineral state when defendant mined it.

It is provided in 30 U.S.C. § 1211(c)(2) that the Secretary shall "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of" the Act, pursuant to which the Secretary issued such regulations, which were amended on June 30, 1982. Those regulations are set forth in 30 CFR §§ 2001, et seq., and are consistent with the provisions of the Act and the contents hereof. It is provided in CFR § 870.5:

> Reclaimed coal means coal recovered from a deposit that is not in its original geological location, such as refuse piles or culm banks or retaining dams and ponds that are or have been used during the mining or preparation process, and *stream coal deposits.* Reclaimed coal operations are considered to be *surface coal mining operations* for fee liability and calculation purposes. (Emphasis supplied)

The stipulation of facts shows that defendant was granted title to usable and merchantable sand, gravel or coal in a segment of the river bed involved, measuring approximately 40 miles long, and that the cut made into the river bed at the dredging site is approximately 200 yards long and that defendant has coal processing installations on the bank of the river. Defendant's defensive allegations in its answer to the complaint that its dredging of coal for commercial purposes "affected two acres or less," for which reason defendant and its dredging operation were not subject to the Act, is belied by the stipulated facts.

As pointed out above, it was agreed that this cause would be submitted to the court for decision upon its merits upon the stipulation of facts and the memorandums of the parties. Plaintiff filed its memorandum after which defendant filed its memorandum accompanied by defendant's motion for summary judgment.

For the foregoing reasons and upon the above stipulation of facts, the court adjudges that defendant's motion for summary judgment is overruled; that instead plaintiff is entitled to have summary judgment entered in plaintiff's favor;[11] that plaintiff is also entitled to recover judgment against defendant on the merits of this action; and accordingly, that in this action plaintiff is entitled to recover judgment against defendant in the sum of $5,660.74, plus statutory interest.

used since the 1800's. See *Jennison, Exr. v. Kirk,* 98 U.S. 453, 25 L.Ed. 240 (1870).

**10.** Significantly, in the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 801, et seq., as amended by the Federal Mine Safety and Health Amendments Act of 1977, Congress saw fit, in 30 U.S.C. § 802(h), to define "coal mine" to mean "an area of land and all structures, facilities . . . and other property real or personal, placed upon, under or above the surface of such land . . . used in . . . the work of extracting in such area . . . coal . . . *from its natural deposits in the earth* by any means or method . . . ," while no provision

of the Act limits "surface coal mining operations" subject to the Act to those which extract coal "from its natural deposits in the earth." Given the purpose of the Act, such is readily understandable.

**11.** "[T]he weight of authority is that [when a party moves for summary judgment] summary judgment may be rendered in favor of the opposing party even though he has made no formal cross-motion [for summary judgment] under Rule 56." Wright, Miller & Kane, *Federal Practice and Procedure:* Civil 2d § 2720, at 29.